STATE OF NEBRASKA, APPELLEE, V. DEREK W. DIXON, APPELLANT.

387 N.W.2d 682

Filed May 23, 1986.    No. 85-486.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Derek W. Dixon appeals his first degree murder conviction by a jury in the district court for Douglas County. The information charged that Dixon "during the perpetration of, or attempt to perpetrate a burglary [did] kill Susan K. Jourdan." Neb. Rev. Stat. § 28-303 (Reissue 1979) provides: "A person commits murder in the first degree if he kills another person . . . (2) in the perpetration of or attempt to perpetrate any sexual assault in the first degree, arson, robbery, kidnapping, hijacking of any public or private means of transportation, or burglary . . . ."

Susan Jourdan, age 76, lived alone in her South Omaha

home. As recently as 1979, Jourdan had two surgical procedures pertaining to cancer, but, with occasional assistance from her family, did light housework. Around 10 a.m. on December 31, 1984, Jourdan's sister, Agnes Hamann, visited by telephone with Jourdan, who said she was going to fix some eggs for breakfast as soon as the sisters finished talking on the phone. Near 9 p.m. on December 31, Ms. Hamann telephoned her daughter, Virginia Hansen, and expressed concern that she had made numerous unanswered telephone calls to Jourdan. The next morning Ms. Hamann recontacted her daughter and again expressed concern that no one answered the telephone at the Jourdan house. Virginia Hansen and her husband went to the Jourdan residence around 10 a.m. on January 1, 1985, found the front door locked, but, looking through a window, saw the interior in "disarray." After unlocking the front door, Hansens entered and saw the telephone, with the receiver out of its cradle, lying in the doorway between the living room and kitchen. On further investigation Hansens found Jourdan, clad in a bathrobe and nightgown, face down on the kitchen floor. From a neighbor's house Hansens called paramedics and police. On arrival and finding Jourdan quite obviously dead, the paramedics made no attempt at resuscitation.

A police officer from a cruiser unit also arrived and found the kitchen door, as an entry at the rear of Jourdan's house, had been "kicked open," the house "ransacked," and the interior of the house was "very cold," noting the presence of ice in some pans in the kitchen sink. The cruiser officer summoned the homicide unit of the Omaha Police Department.

As part of their investigation on that morning of January 1, officers of the homicide unit examined the hollow-core, wooden kitchen door which allowed entry from the outside by way of an enclosed porch. A window in the kitchen door was shattered, and window glass was scattered immediately inside the doorway. The door itself was damaged. Below the area of the lock and doorknob, the hollow-core, wooden door was broken; that is, the lower part of the door was separated from the upper portion and was lying inside the kitchen. In the separated door panel was a jagged hole at the bottom left side.

Further investigation by the officers disclosed other

pertinent facts. The cord from the living room telephone jack had been torn from the plug-attachment to the phone. The thermostat for the house's oil furnace was set at 78 °F, but the furnace was not operating. Officers restarted the furnace by using the reset button. Outside temperature was -11 °F. One officer found ice, approximately ³/₈-inch thick, formed in kitchen utensils in the sink. Coin wrappers were found in the living room, coin banks had been rifled, and a wrapped roll of pennies was discovered near the kitchen exit. Drawers of various furniture items were open, and contents, such as papers and clothing, were strewn on the floor. A "space heater" was located, but not then in use, in the living room. A scorched pan containing three eggs was found on the kitchen stove with the burner on a low setting. Through "dust" for fingerprints, a latent palm print was "lifted" from the area at the kitchen door. Also, from the site of the hole in the broken kitchen door, police obtained a print from a shoe with a tread sole. The shoe print was later identified as the type from a Puma brand tennis shoe.

On the morning of January 5 the police crime laboratory identified the palm print as that of Derek Dixon, age 20, who had been arrested for robbery five times and use of a firearm in the commission of a felony once. A warrant was issued for Dixon's arrest on a charge of burglary. Later, on January 5 Omaha police were notified that Dixon was in custody at Liberty, Missouri, in the Clay County jail.

Police detectives Paul Wade and Richard W. Circo, equipped with the warrant for Dixon's arrest on burglary, went to Liberty, Missouri, on January 6. At the Clay County jail, after informing Dixon of his *Miranda* rights, Wade and Circo commenced interrogating Dixon. During interrogation, Dixon asked the nature of the charge against him, and one of the officers produced the arrest warrant, which Dixon read. Dixon asked, "What evidence do you have?" One officer responded, "[T]he Judge has the evidence," and for the first time Dixon was told that his palm print had been found at the Jourdan residence. When Dixon asked to see the "evidence," the officers handed Dixon a copy of the "Criminalistic Report" made by the Omaha Police Department's crime laboratory. That report indicated Dixon's palm print matched the print

obtained at the Jourdan residence. When Dixon became silent, Detective Circo told him "he would feel better if he . . . told the truth" and asked, "Are you sorry for going in there?" Dixon made no answer. When again asked if he was "sorry for going in there," Dixon nodded his head affirmatively and then stated, "If I talk, I'll go to jail. If I don't talk, I'll go to jail." Dixon asked to see Detective Wade's "calling card," which designated Wade as an officer of the "homicide unit" of the Omaha Police Department. Dixon responded: "How come you're here from the Homicide Unit? The warrant says 'burglary.' " Wade answered, "We are here to investigate the entire case." Dixon denied taking anything from Jourdan's house and then volunteered,

> We were just driving around. I went up to the door and knocked. I wanted to use the phone. I went in. She was laying on the floor, trying to use the phone. I told her I wanted to use the phone, and she stared at me, and I went over and pulled the cord out of the phone.

Dixon next admitted that he had taken $50 from the Jourdan house and asked, "Is she dead?" to which Detective Circo replied, "Yes." Dixon remarked, "I never touched her . . . the autopsy will show that." Dixon became distraught, and the officers terminated interrogation.

After the detectives returned to Omaha with Dixon on January 7, Dixon was booked on a charge of burglarizing Jourdan's house. Officers obtained a search warrant for Dixon's personal effects brought from Missouri and found a pair of high-top Puma tennis shoes. The Pumas and the broken door from Jourdan's house were sent to the FBI crime laboratory for tests. On January 8 an additional complaint charged Dixon with Jourdan's murder during perpetration or attempted perpetration of a burglary. Later, the original complaint charging Dixon with burglary was dismissed by the county attorney.

Dixon filed a motion to suppress his statements made to the detectives at the Clay County jail in Missouri. Dixon testified at the suppression hearing and acknowledged that, during interrogation by Detectives Circo and Wade, he was not "drunk or under the influence of drugs or anything." Dixon also

acknowledged the detectives' admonition of Dixon's *Miranda* rights. In describing his interrogation Dixon testified:

> [S]omeone had asked me a question, and I told them that if I answered the questions or I don't answer the questions, I was going to jail still.
>
> So then he had asked me, what do I think would be best, and then he gave me the parable of two children caught stealing in a store, or something of that nature. And he said — he asked me, if I had kids, which one would I punish if they had both got caught stealing and this one here comes home and tells his mother that he didn't get — that he wasn't stealing, and this one said he was, which one would she get on the most, you know. .

When asked the meaning of the "parable of the two children," Dixon explained: "It had meant like, you know, if I told him whatever I know, it would be better than not to say nothing, you know," believing that he would be punished more severely if he did not discuss the matter with the detectives.

Detective Circo testified at the suppression hearing. According to Circo, there had been the suggestion to Dixon that he should be honest in discussing matters with the detectives. Circo denied mentioning any "parable" about two children and their mother.

The district court overruled Dixon's motion to suppress and, later, a jury trial commenced.

Detectives Circo and Wade testified about their conversations with Dixon and his statements to the detectives. Wade testified that he recalled Circo's telling Dixon about the parable of the two children while the detectives were driving Dixon back to Omaha. Wade explained that such conversation was an effort to quiet Dixon during his emotional outburst en route to Omaha. Circo again denied mentioning any parable to Dixon.

An FBI agent-technician described the method for comparing and identifying footprints, concluding that the shoe print on the Jourdan kitchen door was made by Dixon's shoe.

Dr. Blaine Y. Roffman, a pathologist, testified about the Jourdan autopsy. Before performing the autopsy, Dr. Roffman conferred with officers of the homicide unit concerning police

investigation after discovery of Jourdan's body. Dr. Roffman observed stasis dermatitis on Jourdan's legs, an indication that an individual is suffering from poor circulation of blood in the lower extremities. On gross examination of Jourdan's heart, Dr. Roffman noted "myocardial fibrosis" or "fibrous connected tissue in areas of the heart," indicating poor circulation of blood. According to Dr. Roffman, Jourdan suffered from a moderate degree of damage to her coronary vessels, "50 percent narrowing by atherosclerosis of the right coronary artery and about 25 percent narrowing by atherosclerosis of the anterior descending branch of the left coronary artery." Atherosclerosis is a "buildup of fatty material within the lumen or opening of the coronary arteries through which blood flows; and so the caliber or the diameter of that opening is reduced by the buildup of plaque inside that vessel . . . ." In Dr. Roffman's opinion the cause of Jourdan's death was cardiac arrhythmia; that is, "the probable sequence of events was she had a cardiac arrhythmia, which is an abnormal rhythm, due to the underlying coronary artery disease which I described in association with being exposed to severe cold weather." As explained by Dr. Roffman, the most common cause of arrhythmia includes any type of "shock influence to the heart," such as "any type of mental shock" due to "emotional shock" or "any extreme environmental change: very hot, very cold; anything that would increase the pressure on the heart to do more than it basically is capable of doing under ordinary circumstances." In further explanation regarding his opinion for the cause of Jourdan's death, Dr. Roffman emphasized that Jourdan's two previous major surgical procedures for cancer and her postoperative activity indicated that "her cardiac status was quite good on a normal day-in-and-day-out basis" and "she was able to handle the activities which she was engaged in without problems." Dr. Roffman reiterated that the "shock value and the emotional trauma inflicted upon this lady at the time of the break-in caused the arrhythmia, which caused her death in association with, later on, exposure to cold." In further explaining his opinion concerning Jourdan's death, Dr. Roffman testified that the "precipitating event" for Jourdan's cardiac arrhythmia was the "emotional trauma of having her

door kicked in and stimulating her heart to beat abnormally, causing her collapse and ultimate death," that is, the

emotional shock value which causes her heart with her diseased process underlying it to abnormally beat, causing her to collapse. How long she lived during that period of time, I don't know. If she lived long enough for the room to be exposed to cold, then the exposure to the cold was certainly an added factor.

Dixon did not testify and did not call any witness.

The court instructed the jury by NJI 14.08 regarding reasonable doubt, namely:

"Reasonable doubt" is such doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. *You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.* A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, bare imagination, or from fanciful conjecture.

(Emphasis supplied.)

Dixon had objected to the emphasized part of the instruction and requested that the court delete that material from the instruction on reasonable doubt.

The jury found Dixon guilty as charged, and the court later sentenced Dixon to life imprisonment.

As errors assigned, Dixon contends: (1) His statements to detectives at the Missouri jail should have been suppressed; (2)

Evidence is insufficient to sustain a finding that Dixon's conduct caused Jourdan's death; and (3) The instruction regarding reasonable doubt is incorrect.

Dixon's claim that the district court should have suppressed his statement made to detectives is based on an allegation of improper influence by the officers; namely, Dixon would receive less punishment if he made truthful statements about the Jourdan homicide.

Voluntariness is the ultimate test to use an accused's statement, admission, or confession as evidence in a criminal prosecution. *State v. Bodtke,* 219 Neb. 504, 363 N.W.2d 917 (1985). To be admissible an accused's statement, admission, or confession must have been freely and voluntarily made, and must not have been the product of or extracted by any direct or implied promise or inducement, no matter how slight. *State v. Robertson,* 219 Neb. 782, 366 N.W.2d 429 (1985). Whether an officer has made a promise for a defendant's statement is a question of fact to be determined by a trial court—a decision which will not be set aside unless clearly wrong. Cf. *State v. Walmsley,* 216 Neb. 336, 344 N.W.2d 450 (1984) (whether a search is consensual is a question of fact for a trial court). See *State v. Beard,* 221 Neb. 891, 381 N.W.2d 170 (1986) (the Supreme Court "will not overturn the trial court's findings of fact when determining the correctness of the [trial court's] rulings on motions to suppress unless those findings are clearly wrong," *id.* at 895-96, 381 N.W.2d at 173). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the "trier of fact" and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress. *State v. Walmsley, supra.* The district court weighed the conflicting evidence concerning the alleged parable Dixon attributed to Detective Circo. Any conflict was resolved in favor of the State. Nothing compels our conclusion that the decision of the district court was clearly wrong in overruling Dixon's motion to suppress. Cf. *State v. LaChappell, ante* p. 112, 381 N.W.2d 343 (1986), where this court held that a district court was clearly wrong in its finding that a defendant was unreasonably seized in reference to a question whether evidence

should be suppressed. Dixon's assignment of error concerning suppression of his statements is without merit.

Next, Dixon contends evidence is insufficient to permit a conviction under Nebraska's felony murder rule reflected by § 28-303(2). Dixon does not argue evidence will not support a finding that he burglarized Jourdan's house in violation of Neb. Rev. Stat. § 28-507 (Reissue 1979) (crime of burglary; elements). Rather, Dixon contends there is no evidence that his presence or conduct in the burglarized house caused Jourdan's death.

In *State v. Perkins*, 219 Neb. 491, 498-99, 364 N.W.2d 20, 26 (1985), this court reviewed a conviction for a homicide occurring during a robbery and stated:

> [T]here need not be an intent to kill in felony murder, only an intent to commit the underlying felony. " 'The turpitude involved in the robbery takes the place of intent to kill. . . .' " [Citing and quoting from *State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982).]
>
> Felony murder is not on the same footing with other forms of first degree murder. Willfulness, deliberation, and premeditation are irrelevant considerations. " 'In [felony murder] it is the particular *actus reus*, the . . . means of the murder, which we have singled out for our gravest criminal sanction and not a particular *mens rea*. . . .' " [Citing and quoting from *State v. Bradley, supra*.]

Conduct is a cause of an event if the event in question would not have occurred but for that conduct; conversely, conduct is not a cause of an event if that event would have occurred without such conduct. See *Saporta v. State*, 220 Neb. 142, 368 N.W.2d 783 (1985).

The Supreme Court of Connecticut, in *State v. Spates*, 176 Conn. 227, 405 A.2d 656 (1978), considered "proximate cause" in relation to a criminal homicide which occurred during a robbery. The defendant bound his victim, who suffered a fatal heart attack. Medical testimony established the cause of the victim's death as a heart attack "brought on by the emotional stress resulting from the action of the defendant." *Id*. at 230, 405 A.2d at 658. The defendant contended that direct infliction of physical injury to a victim is indispensable to establish

criminal conduct as the cause of a victim's death. The Supreme Court of Connecticut concluded:

> "Every person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result." [Citations omitted.] If Murdock's death came about as a result of the conjunction of his heart disease and the violence, shock or excitement caused by the defendant's acts, it was still brought about by the criminal "conduct" of the defendant, for the consequences of which he is answerable. [Citations omitted.]
>
> . . . "Proximate cause" in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. [Citations omitted.] It is unnecessary for "proximate cause" purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible.

*Id.* at 233-35, 405 A.2d at 660.

*Durden v. State*, 250 Ga. 325, 297 S.E.2d 237 (1982), involved the Georgia felony murder rule applied to a death in

conjunction with a burglary. The victim, responding to a burglar alarm in his store, notified police about the burglary in progress, went to his store, and exchanged shots with the burglar. Although the victim was not wounded, he died within a few minutes after the police arrived. Medical testimony established the cause of the victim's death was "cardiac arrest caused by the victim's small coronary arteries and the stress of events before the victim's death." *Id.* at 325, 297 S.E.2d at 239. The Supreme Court of Georgia held:

> Where one commits a felony upon another, such felony is to be accounted as the efficient, proximate cause of the death whenever it shall be made to appear either that the felony directly and materially contributed to the happening of a subsequent accruing immediate cause of the death, or that the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

*Id.* at 329, 297 S.E.2d at 241-42.

Several other jurisdictions have also held a victim's fatal heart attack, attributable to a defendant's criminal conduct directed toward that victim, supplies the causal connection between the victim's death and the defendant's criminal conduct; for example, *People v. Stamp*, 2 Cal. App. 3d 203, 82 Cal. Rptr. 598 (1969) (60-year-old victim with an advanced case of atherosclerosis; pathologist's opinion: fright induced by a robbery was "too much of a shock" to the victim's system and caused death); *Booker; Bridges v. State*, 270 Ind. 498, 386 N.E.2d 1198 (1979) (74-year-old robbery victim suffered from arrhythmia, which was brought on by emotional stress from the robbery and led to cardiac arrest); *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979) (victim, suffering from high blood pressure and hardening of the arteries, had a previous heart attack before armed robbery by the defendant; pathologist's opinion: severe stress caused the victim's "heart to stop").

We, therefore, hold that a victim's fatal heart attack, proximately caused by a defendant's felonious conduct toward that victim, establishes the causal connection between felonious conduct and homicide necessary to permit a conviction for felony murder in violation of § 28-303(2).

The evidence at Dixon's trial provided the jury with an appropriate basis to find that Dixon had burglarized the Jourdan house. In his statement given to the detectives, Dixon admitted his presence at and entry into the Jourdan home. Dixon's palm print and his shoe print corroborate such statement. The shoe print, the hole in the door, the broken and scattered window glass inside the kitchen doorway, the bottom part of the fractured door within the kitchen, and possession of money taken from the Jourdan house competently show Dixon's willful, malicious, and forcible breaking and entering Jourdan's home, burglary in violation of § 28-507.

Dr. Roffman's testimony provided the jury with opinion evidence on the fact of causation, whether Dixon's felonious entry into the house caused Jourdan's death. Dixon admitted to Detectives Circo and Wade that Jourdan was alive when he entered the house. The implosion of window glass and part of the wooden kitchen door would startle the most imperturbable individual. Seeing Dixon coming through the doorway into the kitchen probably would stir one to "stare" at him, visual fixation founded in fear intensified by Dixon's ripping the "cord out of the phone." All that unfolded before Susan Jourdan, 76 years old and living alone. What total terror likely seized and constricted Susan Jourdan's heart may be beyond another's comprehension. What the jury did understand was Dr. Roffman's explanation of the cause of Susan Jourdan's death, "emotional trauma of having her door kicked in and stimulating her heart to beat abnormally, causing her collapse and ultimate death."

As we expressed in *State v. Schott, ante* p. 456, 462, 384 N.W.2d 620, 625 (1986): "A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the verdict." Such quantum of evidence exists in the present case.

Finally, Dixon challenges the propriety of the trial court's giving NJI 14.08 regarding characterization of "reasonable doubt." Within the past few weeks we have considered and rejected challenges to the correctness and adequacy of NJI 14.08 which were identical to the question raised by Dixon. *State v. Beard*, 221 Neb. 891, 381 N.W.2d 170 (1986), and *State*

*v. Bostwick, ante* p. 631, 385 N.W.2d 906 (1986), have already disposed of Dixon's challenge to the court's instruction on reasonable doubt.

AFFIRMED.

WHITE, J., participating on briefs.