STATE OF NEBRASKA, APPELLANT, V. BERNARD G. PHELPS,
APPELLEE.
456 N.W.2d 290

Filed June 8, 1990.    No. 90-045.

Ronald L. Staskiewicz, Douglas County Attorney, and
Maria R. Leslie for appellant.

Thomas M. Kenney, Douglas County Public Defender, and
Brian S. Munnelly for appellee.

SHANAHAN, J.

In its information, the State charged Bernard G. Phelps with
first degree sexual assault. See Neb. Rev. Stat. § 28-319(1)(c)
(Reissue 1989). Phelps filed a motion to suppress his custodial
statements. See Neb. Rev. Stat. § 29-115 (Reissue 1989)
(suppression of a defendant's statement). Because the district
court for Douglas County sustained Phelps' suppression
motion, the State appeals to obtain review by a judge of this
court, pursuant to Neb. Rev. Stat. § 29-116 (Reissue 1989).

Sgt. Michael Cavanaugh, an Omaha police officer assigned
to criminal investigations, received information regarding
occurrence of a sexual assault. Later that same day, Cavanaugh
spoke with the victim at a hospital, where the victim indicated
that Bernard Phelps was her assailant. Cavanaugh proceeded to
the Phelps home and told Phelps that he wanted to ask some
questions regarding an alleged sexual assault. In the course of
this meeting, Cavanaugh arrested Phelps on "suspicion of
sexual assault" and transported Phelps to police headquarters
for further questioning.

On arrival at police headquarters, Phelps was taken to an
interrogation room, where Cavanaugh advised him of his
*Miranda* rights. Phelps stated that he understood his rights and
that he was willing to speak with Cavanaugh regarding the
alleged assault. Phelps was not under the influence of alcohol
or drugs and spoke freely with Cavanaugh, but appeared
nervous. Only Phelps and Cavanaugh were in the interrogation

room.

Initially during the questioning, Phelps denied any contact with the victim. However, about 10 to 15 minutes into the interrogation, Cavanaugh stated that the victim had described Phelps' clothing and that Phelps' clothing at the time of the interview matched exactly the description of the clothing worn by the victim's assailant. Further into the interview, Cavanaugh said that Phelps might have to submit to a penile swab with a "Q-tip." A penile swab is performed to determine, through laboratory analysis, if an assailant's penis bears any secretions originating from contact with the victim and is obtained pursuant to Neb. Rev. Stat. §§ 29-3301 et seq. (Reissue 1989) ("identifying physical characteristics act," which prescribes a procedure for obtaining certain physical data from an individual for identification purposes). Questioning at the suppression hearing provides details of Cavanaugh's conversation with Phelps concerning the penile swab:

Q. At what point in time did you talk to him about taking a—a—a sperm sample or using a Q-tip to get a sperm sample?

A. It was during the interview.

Q. OK, this is while he was still denying it?

A. Ummm, yes.

Q. OK. Basically you were telling him that you did not believe him, that he didn't have any sexual encounter with her, and that you could use a—a test to determine whether he—whether his semen matched with what you found in the victim—or what the doctors found in the victim?

A. Yes, I did explain the test would—would match up the semen and would be pretty conclusive.

Q. OK. And you told him that before you told him anything about this clothing that she described?

A. I don't know which I told him first. You know, they—they both were mentioned. I—I don't know which one was mentioned first.

Q. And you told him—Did he seem concerned about the—the test?

A. Yeah, he did.

Q. What did he ask you?

A. Well, he—he—He wanted to know how it was done. I—I think he might have been a little concerned that—you know, how accurate it was, and he also asked if it was painful.

Q. So he was concerned about not how it was done but how actually the—the test was taken—how they were going to get sperm from his penis, correct?

A. Well, I—I think he was concerned about, I think, how incriminating it would be to him, how accurate it would be, and also he did have some concern about the pain, yes.

Q. Did you tell him how the test would be done?

A. Ummm, generally, yeah. I—I—At the time I'd only observed probably two prior tests of this—of this type, so I—You know, I told him basically they use a Q-tip and, you know, swab the—the exterior and—and the inside of his penis.

Q. Did you tell him, Sergeant Cavanaugh, if he admitted to this, it wouldn't be necessary to have this swabbing test?

A. I don't think I told him that in so many words. I don't think I—I—I told him it would probably be done to try to establish the fact that it happened, uh, but I don't think I said in so many words, "Hey, if you confess to it, we won't do it." I wouldn't have worded it that way.

Q. What was the reason for bringing—for bringing it up? It was an interrogation technique, correct?

A. Yes, it was.

Q. So what you were trying and to—By the technique, what you were trying to get across to him is that "We will do this test if you don't admit to it"?

A. Yes.

Q. Did you ever tell—tell him that the Q-tip itself is going to be stuck inside the penis in order to get the—the sample?

A. When he asked me how the test was done, I—I did tell him they did insert it, and they also do it on the—on the outside as well. When he asked me how it was done, you know, I tried to explain it, you know, as best a layman

can, I guess.

Q. And when he asked whether it hurt or not, you told him you didn't know?

A. I said I think it does hurt. I said I think there is some discomfort.

Q. And why did you tell him that?

. . . .

A. Because the people that I had seen undergo this test before have shown some discomfort and pain.

After Cavanaugh's description regarding the penile swab, Phelps orally admitted that he had had sexual intercourse with the victim, but claimed that the victim had consented. Phelps also gave a written statement to Cavanaugh in which Phelps, in substance, admitted that the victim and he had engaged in consensual sexual intercourse. In view of those statements during the interrogation, which lasted 35 minutes, Phelps was "booked" and later charged with first degree sexual assault.

Phelps filed a motion to suppress his statements obtained during the interrogation process and asserted that his statements were involuntary and the product of coercion "by threats and promises." At the suppression hearing, Phelps argued that Cavanaugh's description of the painful penile swab precluded voluntariness in Phelps' statements, which are, therefore, constitutionally inadmissible. Based on Cavanaugh's testimony and description of the penile swab procedure, the district court concluded that

the detailed discussion about the insertion of a stick enlarged by a piece of cotton into the opening in the tip of the defendant's penis (allowing him to imagine how deep the insertion might be), coupled with the Officer's assurance that the procedure would be painful, constituted a threat which renders [Phelps'] admissions involuntary,

and that "the defendant's oral admissions and written statement [are] involuntary. The defendant's motion to suppress is granted, and the oral and written statements are suppressed."

The State contends that Phelps' statements are voluntary

and not the result of any coercion. The State further argues that Cavanaugh's statements regarding the penile swab merely communicated to Phelps an "intent to do an act permissible under law," brief for appellant at 8, that is, the State's right to obtain physical data pursuant to the identifying physical characteristics act, and did not amount to coercive conduct in violation of Phelps' constitutional rights.

## STANDARD OF REVIEW

"In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous." *State v. Copple*, 224 Neb. 672, 689, 401 N.W.2d 141, 154 (1987).

"In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the 'trier of fact' and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress." *State v. Dixon*, 222 Neb. 787, 795, 387 N.W.2d 682, 687 (1986).

## VOLUNTARINESS OF PHELPS' STATEMENTS

The admissibility of a defendant's custodial statements depends on all the circumstances under which the statement is made. "[T]o be admissible, an accused's statement, admission, or confession must have been freely and voluntarily made, and must not have been extracted by any direct or implied promise or inducement, no matter how slight." *State v. Robertson*, 219 Neb. 782, 787, 366 N.W.2d 429, 433 (1985). See, also, *State v. Dixon, supra*; *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985). This court examined voluntariness of a defendant's statement in *State v. McCurry*, 228 Neb. 841, 846-47, 424 N.W.2d 364, 368 (1988), and stated:

As we observed in *State v. Bodtke*, 219 Neb. 504, 510, 513, 363 N.W.2d 917, 922-23 (1985): "As expressed by Justice Frankfurter in *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961): 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession

the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' . . .

". . . Use of an accused's involuntary statement . . . so offends due process and fundamental fairness in a criminal prosecution, because one acting with coercion, duress, or improper inducement transports his volition to another who acts in response to external compulsion, not internal choice. With voluntariness as the ultimate test regarding an accused's statement, the focal point of inquiry into voluntariness is whether the statement is 'the product of a rational intellect and a free will.' [Citations omitted.]

". . . .

". . . To be admissible, a statement or confession must have been freely and voluntarily made. [Citations omitted.]"

In *State v. Norfolk*, 221 Neb. 810, 819, 381 N.W.2d 120, 127 (1986), we stated: "The State bears the burden of proving that a defendant's statement was voluntarily made, before that statement is admissible as evidence against the defendant. See *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984). In determining whether the State has satisfied its burden, a court examines the totality of the circumstances to ascertain whether the defendant's statement 'is "the product of a rational intellect and a free will." ' [Citation omitted.]"

See, also, *State v. Dixon, supra.*

A law enforcement officer's communication to a defendant which expresses the officer's intention to take a course of conduct permissible under the law is not, by itself, coercion preventing voluntariness of the defendant's statement in response to the officer's communicated intention. *State v. McCurry, supra.* However, under the circumstances surrounding the interrogation of Phelps, the trial court concluded that Cavanaugh's statements reasonably indicated a

physical procedure which would subject Phelps to pain and trauma and that the imminent prospect of the procedure prevented Phelps' statements from being " ' "the product of an essentially free and unconstrained choice . . . ." ' " *State v. McCurry, supra* at 846, 424 N.W.2d at 368. Although seeking to characterize sensation from a Q-tip inserted into the urethra as rather minor "discomfort or slight pain," brief for appellant at 11, the State, nonetheless, stands on Cavanaugh's description of the penile swab and its consequent pain. The district court concluded that pain, to render a defendant's statement involuntary, need not be of such nature or degree that would have resulted in recoil by Tomás de Torquemada of the Spanish Inquisition. In view of the circumstances surrounding Phelps' statements in question, the State has failed to satisfy the burden of proving that Phelps' statements were voluntarily made, " ' "the product of a rational intellect and a free will." ' " *State v. Norfolk*, 221 Neb. 810, 819, 381 N.W.2d 120, 127 (1986).

The district court's findings and conclusions are not clearly erroneous. Therefore, the district court's suppression order is affirmed.

AFFIRMED.