No. 73,340

STATE OF KANSAS, *Appellee*, v. DONOVAN LEROY SHAW II,
*Appellant*.

(921 P.2d 779)

Opinion filed
July 12, 1996.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Julie A. McKenna*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Donovan Shaw appeals convictions of felony murder, aggravated robbery, aggravated burglary, conspiracy to commit aggravated burglary, and misdemeanor theft. He argues that (1) there was insufficient evidence that he caused the victim's death to sustain the conviction for felony murder; (2) the pathologist's opinion should not have been admitted into evidence; (3) the trial court erred in not granting Shaw's motion for change of venue due to pretrial publicity; and (4) the trial court erred in failing to give the instruction requested by Shaw on voluntary intoxication.

On Saturday, March 5, 1994, a neighbor found William Trembley's body. Trembley's hands and feet had been bound with duct tape, and his hands were secured to the foot of the bed with tape. His body, from about mid-chest down, was off the bed. There was duct tape over his mouth. When the emergency medical team arrived at approximately 7 p.m., Trembley's body was cold, and his upper extremities had become stiff. His telephone was dead; the wire had been cut outside the house. The screen was off a window on the south wall of the house, and it was determined that the house had been entered through that window. In the front room, the drawers of a chest of drawers "were pulled open as if someone had looked through them." In the kitchen, there were wrapped and loose coins scattered on the floor, and on the stove was a wooden chest about half filled with wrapped coins. The hasp on the chest had been pried off. In the bathroom, a piggy bank, coins, and coin wrappers were on the floor. A white box about the size of an army foot locker had been pried open, and there were coins and coin wrappers in it.

Dr. James Cooper, a pathologist, performed an autopsy on the body of William Trembley. He found numerous bruises and abrasions. He identified the cause of death as acute myocardial infarction, that is, recent death of the heart muscle. Dr. Cooper explained that heart cells die "[w]hen the demand of the heart for oxygen is not supplied by the blood supply to the heart." This imbalance between oxygen demand and supply may occur, he testified, "[w]hen there's preexisting narrowing and then demands [are] placed on the heart [so] that the amount of oxygen in the blood getting to the heart is not adequate." He added that the demands placed on the heart could be from physical exertion or an elevated adrenalin level.

Dr. Cooper found arteriosclerotic cardiovascular disease in Trembley, who was 86 years old at the time of death. In some areas it was mild; in other areas it was severe. Dr. Cooper testified that "[o]verall it would be classified as moderate." This condition is a narrowing of arteries, which decreases the supply of blood available to the heart. A small area of the back wall of the left ventricle of

Trembley's heart showed scar tissue from a heart attack which had occurred at least 6 months earlier.

Trembley had been a patient of Dr. Cathcart-Rake, an internal medicine specialist in Salina, for approximately 14 years. He had last seen Trembley in January 1994. At that time, Trembley weighed 107 pounds. He had been a smoker in the past, he was being treated for high blood pressure, "which wasn't really much of a problem," and he had mild emphysema. Trembley had reported no symptoms of a heart condition to his doctor, nor was he being treated for any type of heart condition.

Based on his examination of the heart cells, Dr. Cooper testified that Trembley lived for at least 6 hours after the heart attack occurred. Trembley lived, at most, 48 hours after the heart attack occurred.

Dr. Cooper answered a number of questions about circumstances which tend to increase the likelihood that death will result from a heart attack. He testified that stress, fear, and physical exertion all would increase the chance of death because they would cause the heart to work harder. Dr. Cooper believed that Trembley's death occurred when his mouth was obstructed by duct tape, his stress level was increased, and he exerted himself physically when struggling against the duct tape with which he was bound.

We will first determine if Dr. Cooper's opinion testimony is admissible, since his testimony is the key to determining if the evidence was sufficient to support Shaw's conviction of felony murder. Shaw urges the court to review this issue de novo. He justifies his position by characterizing the evidentiary rules governing admissibility of expert witnesses' opinions as "legal boundaries." We decline to do so. The accepted standard was stated in *State v. Lumbrera*, 257 Kan. 144, Syl. ¶ 4, 891 P.2d 1096 (1995): "The admissibility of expert testimony lies within the sound discretion of the trial court, and its determination will not be reversed on appeal absent a showing of an abuse of discretion."

Admission of expert testimony is governed by K.S.A. 60-456(b) and (d):

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1)

based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Shaw concedes that the pathologist was testifying from within the scope of his special knowledge in stating that Trembley died of a heart attack and that heart attacks may be induced by stress or trauma. He objects, however, to the pathologist's expressing the opinion that Trembley's fatal heart attack was induced by stress or trauma. He refers to this testimony as "speculat[ion] about fact[s] that cannot be proven." It should be noted that Dr. Cooper actually named three factors that he believed had combined to cause Trembley's heart to malfunction. Dr. Cooper cited lack of oxygen, emotional trauma, and unusual physical exertion.

Dr. Cooper was asked to formulate his opinion on the basis of the information obtained from the autopsy, Trembley's age, his history of smoking and high blood pressure, and his emphysema and absence of complaints of chest pain, as well as the time and circumstances of death. He was asked to bring his education and experience to bear on the question. And he was directed to formulate his opinion with a reasonable degree of medical certainty. In these circumstances, Shaw's charge that the pathologist's opinion was "purely speculative" is unpersuasive. Nor has Shaw shown that the trial court judge abused his discretion. We conclude that Dr. Cooper's testimony was properly admitted into evidence.

We next consider if there was sufficient evidence to sustain Shaw's conviction of felony murder. Our standard of review is well established:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v. Richmond*, 258 Kan. 449, Syl. ¶ 1, 904 P.2d 974 (1995).

In the present case, Shaw challenges the sufficiency of the evidence that the presence or conduct of the burglars in Trembley's house

caused his death. Shaw relies on *State v. Hearron*, 228 Kan. 693, 696, 619 P.2d 1157 (1980), for the familiar factors to be considered with respect to the causal relationship of the underlying felony and the killing:

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide. When we apply the factors of time, distance, and causal relationship to the facts of this case, we have no hesitancy in holding that it was a factual issue for the jury to determine whether the killing of [the victim] occurred during the commission of the attempted burglary."

*Hearron*, it is said by Shaw, is a key Kansas case on the issue of causation in felony murder. He does not rely on *Hearron* as being factually comparable to the present case, and it is not.

Shaw relies on a New Mexico case as rejecting the "notion that a felony can [be] deemed to have caused anything that occurs during the res gestae of a homicide." In *State v. Harrison*, 90 N.M. 439, 441-42, 564 P.2d 1321 (1977), the New Mexico Supreme Court defined causation in felony murder as follows: "[C]ausation must be physical; causation consists of those acts of defendant or his accomplice initiating and leading to the homicide without an independent force intervening, even though defendant's or his accomplice's acts are unintentional or accidental." In a footnote, the court further explained: "A policeman who shoots at an escaping robber but misses and kills an innocent bystander would be considered a dependent, intervening force, and the robber would be criminally liable for felony murder under this test. Lightning striking and killing the bystander would be an independent, intervening force." 90 N.M. at 442 n.1.

It is Shaw's contention that, in effect, lightning struck Trembley. Shaw asserts that in Trembley's condition he could have had a heart attack at any time. Shaw would discount the pathologist's testimony that Trembley's heart attack was caused by agitation from the burglary as "mere conjecture and speculation." He concedes that "[t]he state may have shown that it is possible that the actions of

the burglars caused Mr. Trembley's death," but he argues that it is the State's burden to prove beyond a reasonable doubt the causal link between the felonious conduct and the death.

Aside from the general discussion of legal causation in a felony-murder case, *Harrison* offers little guidance for the present case due to widely differing fact patterns in the two cases and differing legal developments of New Mexico and Kansas. The issue presented to the New Mexico appellate court was whether Harrison's conviction of false imprisonment, which was not a "first-degree felony," would support the presumption that one who committed that felony had the requisite *mens rea* to commit first-degree murder. 90 N.M. at 442.

The narrow issue addressed in *Harrison* is settled law in Kansas. The felony-murder statute in this state provides: "Murder in the first degree is the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). Both aggravated robbery and aggravated burglary are designated inherently dangerous felonies. K.S.A. 21-3436(a)(4) and (10).

The State cites *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986), which involved the death of a 76-year-old woman from cardiac arrhythmia due to emotional trauma and, perhaps, exposure to cold. The medical evidence was that her arrhythmia was precipitated by the shock of having her door kicked in by Dixon. She collapsed from her abnormal heartbeat. If she was still alive when Dixon left, the extreme cold to which she was exposed by the broken door contributed to her ultimate death. Dixon challenged the sufficiency of the evidence of felony murder. He contended that there was "no evidence that his presence or conduct in the burglarized house caused [the victim's] death." 222 Neb. at 796. As a threshold matter, the Nebraska court examined foreign cases with comparable facts. From that review, it concluded that "a victim's fatal heart attack, proximately caused by a defendant's felonious conduct toward that victim, establishes the causal connection between felonious conduct and homicide necessary to permit a conviction for felony murder." 222 Neb. at 798. The court

then reviewed the evidence from Dixon's trial. It concluded that there was sufficient evidence of his forcible breaking into the victim's house and that the coroner's explanation of the cause of her death provided the jury with opinion evidence on the fact of causation. 222 Neb. at 799. Thus, the felony-murder conviction was upheld.

The State also relies on the cases discussed by the Nebraska court. In *State v. Spates*, 176 Conn. 227, 405 A.2d 656 (1978), *cert. denied* 440 U.S. 922 (1979), a robbery victim suffered a fatal heart attack after being handcuffed during the robbery and left on the floor despite his plea that a doctor be called because he was suffering a heart attack. Spates argued that there could be no culpable homicide in the absence of corporal harm inflicted by the defendant on the victim. The court rejected the view as one which long since had been outmoded. 176 Conn. at 231. Spates fashioned a similar argument in terms of proximate causation. He focused on the victim's weakened condition due to prior heart attacks. The court considered the death to be a foreseeable and natural consequence of the defendant's act which was not diminished in its criminality if other causes, including the preexisting heart condition, cooperated to produce it. 176 Conn. at 232-33. The court expressed the view that Spates took the victim as he found him. Thus, if the victim's "death came about as a result of the conjunction of his heart disease and the violence, shock or excitement caused by the defendant's acts, it was still brought about by the criminal 'conduct' of the defendant, for the consequences of which he is answerable." 176 Conn. at 233.

In *People v. Stamp*, 2 Cal. App. 3d 203, 82 Cal. Rptr. 598 (1969), *cert. denied* 400 U.S. 819 (1970), the court considered an armed robbery of a business office in which the workers were required to lie on the floor. Within 15 or 20 minutes after the robbery, the manager died of a heart attack. The evidence with regard to the manager's general condition was that he was obese, had a history of heart disease, was under a great deal of pressure in his business, and did not take good care of his heart. There was medical evidence that the manager suffered from "an advanced case of atherosclerosis, a progressive and ultimately fatal disease." 2 Cal. App. 3d at

208. Nonetheless, three doctors concluded that he would not have had a seizure at that time if it had not been for the robbery. With regard to the sufficiency of proof of causation, the court concluded: "[T]here was substantial evidence of the robbery itself, that appellants were the robbers, and that but for the robbery the victim would not have experienced the fright which brought on the fatal heart attack." 2 Cal. App. 3d at 209.

In *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979), a robbery victim suffered lacerations and contusions consistent with blows of a baseball bat. According to the medical examiner, the injuries enormously stimulated the heart and blood pressure, bringing on the victim's death. The medical testimony further showed that the victim's heart was in terrible condition, that he suffered from severe hardening of the arteries, and that he probably had suffered an earlier heart attack. The medical examiner called the victim "a walking bombshell." 298 N.C. at 682. Atkinson argued that the State had not proven a causal link between the blows inflicted during the robbery and the death. The court rejected the argument in the following words:

"The consequences of an assault which is the direct cause of the death of another are not excused nor is the criminal responsibility for the death lessened by a preexisting physical condition which made the victim unable to withstand the shock of the assault and without which preexisting condition the blow would not have been fatal." 298 N.C. at 682.

In *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983), the defendant was convicted of felony murder. The underlying felony was the theft of a silver tray from the victim's home in Arkansas, where the victim was killed. The defendant contended that the theft had been completed in Arkansas prior to the killing of the victim and, therefore, could not support a conviction of felony murder. This court disagreed, stating:

"[The victim's] property stolen in Arkansas was brought into Wilson County, Kansas. Time, distance, and the causal relationship between the underlying felony and killing are factors to be considered in determining whether the killing is a part of the felony and therefore subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony murder rule is ordinarily a question of fact for the

jury to decide. [Citation omitted.] When the evidence is conclusive, as a matter of law, and the murder occurred within the res gestae of the crime, the trial court need not instruct that determination of whether the murder occurred within the res gestae is a fact question for the jury. [Citation omitted.]

"A literal reading of [K.S.A. 21-3401] would find any felony to be sufficient to support a charge of felony murder if a causal relation exists. The purpose of the statute is to deter those engaged in felonies from killing negligently or accidentally, and that doctrine should not be extended beyond its rational function which it was designed to serve. To invoke the felony murder rule there must be proof that a homicide was committed in the perpetration of or an attempt to perpetrate a felony and that the collateral felony was one inherently dangerous to human life." 233 Kan. at 631.

In the present case, the medical evidence of the cause of death was given by Dr. Cooper, who performed the autopsy of Trembley. The pathologist was asked what, in his opinion, precipitated the myocardial infarction. He responded that a combination of factors caused the heart attack—Trembley's heart's need for oxygen was not met due to the tape which covered his mouth, his adrenalin level was increased due to stress, and his physical exertions due to struggling against the tape with which he had been bound caused his heart to work too hard. Dr. Cooper's opinion took Trembley's age, condition, and history into account:

"Q. Dr. Cooper, . . . for the purposes of responding to this question I want you to consider the information you obtained as a result of performing your autopsy on William Trembley. Additionally, that you consider that William Trembley was a man 86 years of age, he had in the past been a smoker, there are indications that he had emphysema, that he had no complaints of chest pain, . . . had a history of high blood pressure, that he was found dead on March the 5th of 1994 duct-taped to his bed at approximately 6:50 p.m. in the evening, that he had duct tape over his mouth at the time that he was found, that he was cold and rigor mortis was present. Now, assuming those facts, based on your autopsy investigation, your education and experience, and based on a reasonable degree of medical certainty, do you have an opinion as to what precipitated the myocardial infarction that related in Mr. William Trembley's death?

"A. Yes, I do.

"Q. What is that opinion?

"A. That the oxygen . . . need of the heart was exceeded by the increased oxygen getting in the blood in the first place. Due to this man with emphysema,

any decrease—like tape or any obstruction over the mouth or nose would decrease the available oxygen, as well as increased stress levels increasing the adrenalin, and any sort of excess physical movement would have increased the work of the heart and all these factors combined.

"Q. And the stress and increased physical movement relating to the duct tape?

"A. Yes."

As stated in the foreign cases cited by the State, the victim must be taken as the defendant finds him. In this case, Shaw encountered an 86-year-old man with emphysema who was being treated for high blood pressure. Shaw's felonious conduct emotionally traumatized Trembley, obstructed his breathing, and caused him to physically exert himself in attempting to break free. In Dr. Cooper's opinion, based upon a reasonable medical certainty, the heart attack was caused by the combined stress, lack of oxygen, and physical exertion. Death resulting from a heart attack will support a felony-murder conviction if there is a causal connection between the heart attack and the felonious conduct of the defendant. Here, Dr. Cooper's testimony provided that causal link between the felonious conduct and the victim's death. Trembley's preexisting condition may have made him unable to withstand the stress and exertion, but it would not lessen Shaw's criminal responsibility. Applying the factors of time, distance, and causal relationship of the felonious conduct and the killing to the facts of this case, we conclude it was for the jury to determine whether the killing of Trembley occurred during the commission of the aggravated burglary and/or aggravated robbery.

A review of all the evidence, viewed in the light most favorable to the prosecution, shows that a rational factfinder could have found the defendant guilty of felony murder beyond a reasonable doubt. Thus, there was sufficient evidence to support the conviction of the defendant for felony murder.

Shaw next argues that the trial court should have granted his motion for change of venue due to pretrial publicity. K.S.A. 22-2616(1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great

a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

In *State v. Lumbrera*, 252 Kan. 54, 845 P.2d 609 (1992), the court discussed the issue of a change of venue based upon extensive pretrial news media coverage:

"The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality." Syl. ¶ 2.

"The defendant must show that such prejudice exists in the community that it was reasonably certain the defendant could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant." Syl. ¶ 3.

It is Shaw's contention that he was entitled to a change of venue as a matter of law because the extent and nature of pretrial news media coverage created an unresolvable dilemma for defense counsel. The objectionable nature of the coverage, according to Shaw, was its focus on his prior criminal record and release from prison as a result of sentence conversion under the Sentencing Guidelines Act. The dilemma was in his not being able to question potential jurors about their gaining information about Shaw's prior criminal record from news coverage without revealing his prior criminal record to those who were not already aware of it.

Shaw's motion for change of venue was accompanied by 12 affidavits of Saline County residents who expressed the belief that Shaw could not receive a fair and impartial trial due to newspaper coverage of the crime. Also attached to the motion are photocopies of newspaper articles from the Salina paper and a press release, dated April 8, 1994, by attorney general candidate Jerry Shelor about crimes committed by men who had been released from prison under the Sentencing Guidelines Act. The press release names Shaw. There is no indication that any of the jurors would have seen the press release. As pointed out by defense counsel during argument on the motion for change of venue, however, two

of the newspaper articles attached to the motion contained references to Shaw's prior criminal record.

The district court denied the motion for change of venue on the ground that Shaw had not satisfied his burden of showing "such pervasive prejudice in the community that a fair trial could not be obtained." In fact, Shaw has not brought to the court's attention anything in the record on appeal which would show that Shaw's trial counsel sought to excuse any prospective jurors on the ground that exposure to pretrial publicity might preclude them from rendering a fair and impartial verdict. In its brief, the State asserts that only four prospective jurors were excused for cause from the first group interviewed. Examination of the transcript of that portion of voir dire shows that one prospective juror was excused so that she could attend a wedding and three were excused due to employment commitments which could not be satisfied by substitutes. Neither party mentions prospective jurors being excused from the second group.

Examination of the transcript also shows that Shaw's trial counsel passed each panel of veniremen for cause. Once the questions to prospective jurors were completed, defense counsel expressed no concerns about the ability of the jury to be fair and impartial in its consideration of the evidence.

Shaw has shown no abuse of the district court's discretion in its denying the motion for change of venue.

Finally, we consider whether the instruction requested by Shaw on voluntary intoxication should have been given to the jury. Shaw proposed that the following instruction be given to the jury: "Voluntary intoxication may be a defense to the charge of aggravated burglary, where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the specific intent to commit a theft." The district court declined defense counsel's request to instruct the jury on voluntary intoxication. This court has stated generally:

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must

be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992).

In addition, in *State v. Shehan*, 242 Kan. 127, 130-31, 744 P.2d 824 (1987), the court considered and discussed the precise issue presented here:

"No Kansas case has been located which prohibits a defendant from asserting an alibi defense as well as offering evidence of voluntary intoxication to negate an element of the crime charged. To the contrary, it has long been recognized that ordinarily a defendant in a criminal case may present and rely upon inconsistent defenses. In *State v. Hunter*, 241 Kan. 629, Syl. ¶ 7, 740 P.2d 559 (1987), the court held that a defendant is not precluded from asserting compulsion as a defense even though he denies commission of the crime. The court cited the general rule that inconsistent defenses are generally permissible in criminal prosecutions. The general rule that intoxication may be asserted even when the defendant relies upon an alibi is stated in 5 Am. Jur. Proof of Facts 2d (1987 Supp.), p. 28, as:

'[T]he defendant may deny the commission of the offense and submit evidence, such as alibi evidence, in support of such denial, while at the same time presenting evidence of intoxication sufficient to prevent the formation of the necessary intent.'

See *People v. Hansma*, 84 Mich. App. 138, 269 N.W.2d 504 (1978); and *State v. Kills Small*, 269 N.W.2d 771 (S.D. 1978). We agree that a defendant in a criminal case may rely upon voluntary intoxication to show a lack of specific intent even though he also relies upon other defenses which may be inconsistent therewith."

Nonetheless, the court affirmed Shehan's convictions:

"We conclude the trial court was in error in refusing the requested instruction on the basis that Shehan relied on the defense of alibi and contended he had nothing to do with the crime. However, where the trial court reaches the correct result based upon the wrong reason, this court will affirm the trial court. *State v. Durst*, 235 Kan. 62, 69, 678 P.2d 1126 (1984). Thus, even though the court erred in the basis for its ruling, if there was not sufficient evidence to submit the issue of intoxication to the jury, no instruction was required and there would be no reversible error.

"The degree of proof necessary in Kansas to establish a submissible issue of voluntary intoxication was considered in the recent case of *State v. Keeler*, 238 Kan. 356, 710 P.2d 1279 (1985). The court stated:

'Where the crime charged requires a specific intent, voluntary intoxication may be a defense and an instruction thereon is required where there is evidence to support that defense. *State v. Sterling*, 235 Kan. 526, Syl. ¶ 2, 680 P.2d 301 (1984). *The defendant has the burden of showing that he was so intoxicated that he was robbed of his mental faculties*, and whether he was drunk to such extent is a

question for the trier of the facts to decide, under proper instructions. 21 Am. Jur. 2d, Criminal Law § 155; *State v. Falke*, 237 Kan. 668, 703 P.2d 1362 (1985).' 238 Kan. at 360. (Emphasis added.)

"In *State v. Payton*, 229 Kan. 106, 622 P.2d 651 (1981), the defendant argued on appeal that his requested instruction on voluntary intoxication was erroneously denied. This court reviewed the record for evidence of defendant's intoxication to determine the propriety of the trial court's ruling that the evidence was insufficient to warrant submission of the issue to the jury. The court concluded; 'The evidence did not show the appellant was intoxicated to the extent that his ability to form the requisite intent was impaired.' 229 Kan. at 114.

"There must be some evidence of intoxication upon which a jury might find that a defendant's mental faculties were impaired to the extent that he was incapable of forming the necessary specific intent to commit the crime. Here; although Shehan testified he and Chambers together disposed of a substantial quantity of liquor and drugs, there was no evidence that, as a result thereof, appellant was intoxicated or that his mental faculties were impaired. To the contrary, the evidence presented by the appellant, when viewed in the light most favorable to him, negates a showing of intoxication. We have carefully considered the authorities relied upon by appellant and find them readily distinguishable from this case. We hold that under the facts of this case there was not sufficient evidence to require the giving of the requested instruction . . . ." 242 Kan. at 131-32.

Thus, the court's inquiry in the present case is whether there was sufficient evidence of Shaw's intoxication to require submission of the issue to the jury. The inquiry must take into account that the burden of showing that he was so intoxicated that he was robbed of his mental faculties so as to be incapable of forming the requisite intent to commit the crime belongs to Shaw. In addition, the evidence must be viewed in the light most favorable to Shaw.

Shaw's brief is singularly uninformative in this matter. In his discussion of this issue, the only mention of evidence of intoxication is the following unsupported assertion: "The evidence in support of the defense of voluntary intoxication is a matter of record." In his statement of facts, the only mention of Shaw's intoxication is the following which appears under the subheading "The alibi":

"Sheldon Judd testified and accounted for his and Mr. Shaw's whereabouts at the time of the Trembley break-in. This testimony was corroborated by Johnny Judd, who was Sheldon's younger brother. Johnny Judd worked at a local restaurant. He worked until about ten in the evening on March 3, 1994. Following work; he went out to Rumors, a Salina bar. He drove, and he was accompanied by his brother Sheldon and Mr. Shaw. The three gentlemen stayed at Rumors until it

closed at about 1:30 a.m. Both Sheldon and Johnny Judd noted that by this time, Mr. Shaw was quite intoxicated. He was stumbling and weaving as he walked through the parking lot."

Shaw's recitation of alibi evidence continues with an account of his whereabouts until approximately 3 a.m., by which time he had "passed out."

Examination of the transcribed testimony of John Judd, the brother of Shaw's codefendant Sheldon Judd, discloses that he went to a club with Shaw and Sheldon after he got off work at 10 p.m. on Thursday, March 3. They left the club at approximately 1:30 to 2 a.m. on Friday, March 4. John testified that while they were at the club he drank two beers, and he described himself as "pretty drunk." With regard to Shaw's condition, John testified that Shaw was "kind of drunk." He testified that Shaw "was staggering all over the place. We got in the car, he had like dry heaves and stuff. I had to make my brother pull over and roll down the window." The three went to the Judds' parents' house and went down into the basement. According to John, Shaw fell asleep very shortly after they got there.

Sheldon Judd testified that, leaving the club at closing time, Shaw "was weaving and bouncing off the cars." Sheldon said Shaw "needed help getting in the car." In the basement, Sheldon and Shaw joked with John about when he was a little kid. After approximately 30 minutes, Shaw went to sleep.

There is no evidence in the testimony of either John or Sheldon Judd about the effects, if any, on Shaw's mental faculties. The only evidence of his intoxication seems to consist of several very general statements about his physical state. There is nothing in the evidence which has been examined that would indicate whether Shaw was capable of forming the necessary intent to commit the crime. Where, as here, there is no evidence to support the defense of voluntary intoxication, the trial court did not err in refusing to give the requested instruction.

The judgment of the district court is affirmed.