No. 70,113

STATE OF KANSAS, *Appellee,* v. JAMES P. LUDLOW, *Appellant.*
(883 P.2d 1144)

Opinion filed October 28, 1994.

*Benjamin C. Wood,* special appellate defender, of Lawrence, argued the cause, and *Jessica R. Kunen,* chief appellate defender, of Topeka, was with him on the brief for appellant.

*Glenn R. Trapp,* assistant district attorney, argued the cause, and *Gerald E. Wells,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: James Ludlow appeals his jury convictions of one count of second-degree murder, one count of attempted first-degree murder, and one count of theft. Ludlow was sentenced to a controlling term of 25 years to life imprisonment.

At approximately 12:45 a.m. on Sunday, November 22, 1992, Tracy Robbins was shot and killed and Valerie Hartley was wounded. James Ludlow was convicted of the shootings and of leaving the scene in a car which was registered to Robbins and Hartley.

The shootings occurred in Robbins' house. In November 1992, Hartley had lived there with him approximately a year. James Ludlow and Macee Nelson lived in the downstairs portion of Robbins' house. Hartley and Nelson had worked together at Teezers in Topeka. Hartley's car was the only vehicle in the household because Robbins' truck and Nelson's car had been repossessed.

Ludlow was very possessive of Nelson. At the time of the shootings, Nelson was working as an exotic dancer in Aberdeen, South Dakota. She had been gone almost a week. On Thursday before the shootings, Hartley called Nelson so that Ludlow could talk to Nelson. Hartley was concerned about Nelson because Ludlow had voiced the suspicion that Nelson "has some other man, and if he found out, then he would kill both of them." On Saturday at 4:10 p.m., Ludlow pawned a microwave oven and a portable CD player. He told Hartley that he was pawning some items to get money so he could go find Nelson.

Robbins, Ludlow, and Hartley then went to Wal-Mart, where Hartley picked up one item she had on layaway and paid on another. The time on Hartley's Wal-Mart receipt was 17:36:43.

From Wal-Mart the three went directly to a pool hall and bar called the Pool Room. Ludlow ordered five shots of Southern Comfort and a large beer. Ludlow said he was celebrating Nelson's being gone. After finishing the first five shots, Ludlow ordered and drank more. After he had been drinking approximately an hour and a half, Ludlow threw up all over the bar.

Robbins took Ludlow home and returned in about 30 minutes to the Pool Room to pick up Hartley. Robbins and Hartley went to a video store, rented several movies, and returned home at approximately 9:00 p.m. Robbins went downstairs to check on Ludlow before he and Hartley began watching the movies they had rented. Sometime while they were watching the movies in the TV room right off the kitchen, Ludlow came upstairs and

joined them for 10 to 15 minutes. Hartley told him that she had cleaned up the mess he made at the bar, and "he just kind of laughed." Ludlow moved back and forth between the upper and lower levels of the house three or four more times, but there was no more conversation. He appeared to be stable and not to be experiencing difficulty walking.

The last time Ludlow appeared upstairs, Hartley and Robbins were in the kitchen talking about who would do the dishes. Ludlow was sitting on the kitchen floor at the top of the stairs. His hands were empty, and Hartley and Robbins continued their conversation and activity. As Hartley reached toward the garbage disposal switch, she heard a gunshot. Robbins fell.

Hartley turned to look at Ludlow and saw that he was still seated and that he was pointing a rifle at her. She hid behind the kitchen island. Ludlow came around and pointed the gun at her head, and she begged him not to shoot her. Hartley ran from Ludlow. He shot her in the hip, and the impact knocked Hartley to the floor. Ludlow fired a second shot, which hit the floor near Hartley's head.

As Hartley lay on the floor, Ludlow stepped over her to enter the bedroom. After being in the bedroom a short time, Ludlow stepped back over Hartley and went into the kitchen. He came back out of the kitchen and rolled Hartley halfway over, saying her name. She tried to act as if she were dead.

Then Hartley got up and ran out the door. She heard another shot but was not hit. She ran to a neighboring house and beat on the doors. When she saw Ludlow leaving in her car, Hartley lay on the ground behind her neighbor's house until Ludlow reached the highway. After Ludlow was gone, Hartley aroused a neighbor and an ambulance was called for her.

Hartley identified the rifle police found in the entryway of Robbins' house as one belonging to Robbins. The last time she saw it before the shootings, it was underneath the bed in the bedroom she shared with Robbins. When Hartley had last seen it, the rifle had a scope on it. Police found the rifle in the entryway of Robbins' house and a scope and two screwdrivers on the couch downstairs.

In Hartley and Robbins' bedroom, the police found an open money box on the bed and a coin purse on an ironing board. Hartley testified that she had $500 in the box a few days before the shootings and that Ludlow knew that was where she kept her money.

About 1:00 a.m. on Sunday, November 22, Ludlow called Nelson at the bar where she was working in South Dakota. He was upset and crying, and he told Nelson that he wanted her to come home. She told him she was only coming back to get her things, and she hung up on him.

Ludlow was arrested in a hotel in Aberdeen, South Dakota, at approximately 11:30 p.m. on Sunday, November 22. Hartley's car was found at a motel near the airport at Sioux City, Iowa. In the hotel room in Aberdeen were found road maps of Iowa, South and North Dakota, and two Northwest Airlines boarding passes. Ludlow told police that he flew to Aberdeen from Sioux City.

Ludlow testified that he went to the Pool Room with Robbins and Hartley with the intention of getting drunk so that he could sleep through Sunday until Monday when Nelson "was supposedly coming home." He testified that he drank 16 shots of Southern Comfort chased with beer and that the last thing he remembers about that evening was picking up the 17th shot. The next thing he could recall was sitting on an airplane and then being taken by cab to the hotel in Aberdeen. Ludlow testified that he did not recall giving a false name when he purchased his airplane ticket, but, when asked why he did so, he stated that he was on parole and did not have the required written permission to leave the state. He denied having any memory of shooting anyone.

Dr. Donald Goodwin, a psychiatrist and professor of psychiatry at the University of Kansas Medical Center, testified on behalf of Ludlow. The focus of his research and practice is the effect of alcohol on animals and humans. Of particular interest to him is memory loss while drinking, sometimes called alcoholic blackout, which is associated with concentrated consumption of large quantities of alcohol. He testified that people in this condition may not seem intoxicated to a casual observer and may do re-

markable things. Based on the accounts of how much Ludlow drank at the Pool Room on Saturday evening, November 21, it was Dr. Goodwin's opinion that Ludlow experienced an alcoholic blackout. He testified that Ludlow could have driven to Sioux City, Iowa, bought an airplane ticket, flown to Aberdeen, and checked into a hotel there during the course of an alcoholic blackout.

The sole issue raised in this appeal is whether the district court's instruction on voluntary intoxication was erroneous. The jury was given the following instruction:

"Voluntary intoxication may be a defense to the charge of Murder in the First Degree, Murder in the Second Degree, Voluntary Manslaughter, Attempted Murder in the First Degree, Attempted Murder in the Second Degree, Attempted Voluntary Manslaughter, and Theft of Property where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent to kill Tracey [sic] Robbins or Valerie Hartley or commit the Crime of Theft of Property.

"The defense of voluntary intoxication requires proof that the intoxication was to such an extent that the defendant was utterly devoid of consciousness or awareness of what he was doing."

The first paragraph of the instruction parallels PIK Crim. 3d 54.12-A. The single-sentence second paragraph of Instruction No. 17 was requested by the State. The prosecutor began her remarks at the instruction conference as follows: "Your Honor, it looks like, for the most part anyway, . . . some of the language we requested the Court to give in our proposed instructions has been given. I notice the second paragraph in number seventeen." Defense counsel did not object to the addition of the second paragraph.

" 'The standard of review applied to jury instruction error requires an objection before the jury retires, stating distinctly the matter objected to and the grounds for the objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414(3). State v. Crabtree, 248 Kan. 33, 39, 805 P.2d 1 (1991).' State v. Thomas, 252 Kan. 564, 576, 847 P.2d 1219 (1993).

This court has stated that '[a]n instruction is clearly erroneous when a reviewing court reaches a firm conviction that, if the trial error had not occurred, there is a real possibility that the jury would have returned a different verdict.' State

*v. Novotny*, 252 Kan. 753, 755, 851 P.2d 365 (1993)." *State v. Castoreno*, 255 Kan. 401, 404, 874 P.2d 1173 (1994).

The first contention made by Ludlow focuses on the PIK language rather than the added language. The contention is that the instruction limited the jury's consideration of voluntary intoxication to intent, whereas K.S.A. 21-3208(2) extends its application to the broader realm of state of mind. The statute provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind." K.S.A. 21-3208(2).

The jurors were instructed that first-degree murder is an intentional killing "done maliciously; . . . deliberately and with premeditation." They were instructed that second-degree murder is an intentional killing "done maliciously." They were instructed that voluntary manslaughter is an intentional killing "done in the heat of passion."

Ludlow asserts:

"The Court instructed the jury that it could only consider the defense in relation to 'intent to kill.' . . . For example, the jury was told that it could not consider whether 'malice' was negated by the intoxication. Additionally, it was told that it could not consider whether premeditation was negated."

Although Ludlow overstates his case, his point is well taken. The jury was not told that it could consider whether malice or premeditation were negated by intoxication, but it was not told that it could not.

PIK Crim. 3d 54.12-A states: "Voluntary intoxication may be a defense to the charge of (*specific intent crime charged*), where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that (he) (she) was incapable of forming the necessary intent (*set out specific intent element of the crime*)." There are cases which show that until recently, the pattern instruction included state of mind in addition to intent. For instance, in *State v. Young*, 253 Kan. 28, 31-32, 852 P.2d 510 (1993), the court discussed the defense of voluntary intoxication as follows:

"In *State v. Beebe*, 244 Kan. 48, 60-61, 766 P.2d 158 (1988), this court concluded that PIK Crim. 2d 54.12 is an adequate statement of the statutory provision on voluntary intoxication. The instruction which the court approved stated:

' "Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind." ' "

The version of the pattern instruction approved in *Beebe* differs somewhat from PIK Crim. 3d 54.12-A. The most obvious change is in the lead-in declaration—voluntary intoxication changes from not being a defense to possibly being a defense. The removal of any reference to "or other state of mind" seems to have been effected at the same time. Our research has failed to explain the deletion of the phrase "or other state of mind." We are not aware of any cases in which modification of the language of the pattern instruction was the subject of discussion; as Ludlow argues, PIK Crim. 3d 54.12-A does not fully reflect the statutory provision of K.S.A. 21-3208(2).

Ludlow assumes that deliberately and with premeditation, maliciously, and in the heat of passion are "other states of mind" within the meaning of 21-3208(2). The State does not question his assumption. In *State v. Jackson*, 238 Kan. 793, 799, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), we said: "The fact that we have required an instruction on voluntary intoxication is merely a response to the legislature's enactment of K.S.A. 21-3208(2) and an attempt to carry out the purpose of the statute."

In *State v. Jones*, 185 Kan. 235, 242, 341 P.2d 1042 (1959), the court quoted from the homicide topics in C.J.S. and Am. Jur. to the effect that passion, fright, terror, and so on are "conditions of the mind" or "emotional states." In *State v. Farris*, 218 Kan. 136, 143, 542 P.2d 725 (1975), a United States Supreme Court decision was discussed as depending on the absence in a federal statute "of any requirement for a particular state of mind such as 'knowingly.' " Black's Law Dictionary 1409 (6th ed. 1990) defines "state of mind" as follows: "A person's reasons and motives for acting as he did."

In *Jackson*, the court discussed permitting the evidence of diminished capacity in specific intent crimes. We said:

"The admission of such evidence for the limited purpose of a partial defense against the specific intent of the crime is the doctrine of diminished capacity or—as designated in many jurisdictions—diminished or partial responsibility. In Lewin, *Psychiatric Evidence In Criminal Cases for Purposes Other Than the Defense of Insanity*, 26 Syracuse L. Rev. 1051, 1060 (1976), Professor Travis Lewin discussed the scope of the partial responsibility defense:

'Partial responsibility is a defense only in specific intent cases. Specific intent crimes are those in which, as one of the essential elements of the offense, the prosecution must prove beyond a reasonable doubt that the defendant entertained a specific objective or engaged in certain specified mental activity. *Examples of specific intent crimes range from aggravated homicides requiring proof of premeditation, deliberation and a design to effect death,* through larceny offenses which require proof that the defendant intended to permanently deprive an owner of personalty of his right to possession, to conspiracy, attempted crimes and all offenses based upon accessorial liability. If for any reason the defendant did not entertain the particular mental state, then he did not commit that crime, although he may, of course, have committed some other or lesser crime not requiring that particular state of mind.' " (Emphasis added.) 238 Kan. at 798.

Subsection (2) of K.S.A. 21-3208 was taken from the Minnesota Criminal Code. See Minn. Stat. § 609.075 (1992). The Minnesota Supreme Court has interpreted "state of mind" to include premeditation within the meaning of Minn. Stat. § 609.075. In *State v. Buchanan,* 431 N.W.2d 542 (Minn. 1988), the defendant appealed his conviction of first-degree murder, contending that he was incapable of forming the necessary intent and premeditation at the time of the killing due to his intoxication. The Minnesota Supreme Court noted that § 609.075 "provides that voluntary intoxication may be taken into consideration in determining whether a particular intent or state of mind existed at the relevant time." 431 N.W.2d at 549. The court held that the defendant has the burden of proving by a fair preponderance of the evidence that he was incapable of forming the necessary intent and premeditation at the time of the killing due to his intoxication. 431 N.W.2d at 549.

In *State v. Hale,* 453 N.W.2d 704 (Minn. 1990), the defendant, relying on § 609.075, appealed from his conviction of first-degree murder, contending there was insufficient evidence to establish intent and premeditation. The court reviewed the evidence and concluded: "The evidence certainly does not compel the conclu-

sion that defendant was incapable of forming the requisite specific intent to kill or of premeditating the victim's death." 453 N.W.2d at 707.

Finally, in *State v. Bowers*, 482 N.W.2d 774 (Minn. 1992), the court stated:

"Appellant argues that the jury could not properly find intent or premeditation because of evidence of his intoxication. Minn. Stat. § 609.075 (1990) provides that 'when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.' . . .

"In this case, the jury could reasonably believe that defendant acted with intent and premeditation, despite the fact that he had been drinking. . . . Thus, the record contains ample evidence to support the jury's conclusion that appellant acted with intent and premeditation." 482 N.W.2d at 778.

We conclude that Ludlow's assumption is correct. Although the use of PIK instructions is strongly recommended by this court, we must conclude that the use of PIK Crim. 3d 54.12-A absent the phrase "or other state of mind" in the present case was error. Premeditation is a "state of mind" and a necessary element of the offense of premeditated murder. However, we are not convinced that the omission of the phrase "or other state of mind" from the instruction was clearly erroneous, requiring reversal.

The jury found that Ludlow was capable of forming the necessary intent to kill Tracy Robbins. We find nothing in the record to convince us that the jury could make that finding and not find that Ludlow was capable of forming the requisite premeditation.

Further, the record does not support Ludlow's contention that he was incapable of forming the requisite premeditation as a result of consuming the Southern Comfort. Prior to Ludlow's consuming the Southern Comfort, he pawned two appliances for money "so he could go find Nelson." After he consumed the Southern Comfort, he showed no outward signs of physical or mental impairment as a result of consuming the Southern Comfort. He appeared stable and not to be experiencing difficulty walking. He had the presence of mind to remove the scope from the rifle before he shot Robbins and Hartley, drive Robbins' automobile to the airport, purchase airline tickets using a false name, board the airplane, and, upon arriving in Aberdeen, take a cab

to the hotel. Although Dr. Goodwin testified Ludlow could have experienced an "alcoholic blackout," *i.e.*, memory loss, he did not say Ludlow was incapable of forming the necessary intent or premeditation. Whether or not the jury concluded Ludlow's plan to kill Robbins and Hartley was formulated before he began drinking, it could have concluded from his subsequent conduct that premeditation, malice, and intent to kill were present. We do not reach a firm conviction that, if the error had not occurred, there is a real possibility that the jury would have reached a different verdict. We therefore find no reversible error.

Ludlow also contends that the devoid of consciousness language in the second paragraph of Instruction No. 17 was error. In *State v. Walker*, 252 Kan. 279, 296-97, 845 P.2d 1 (1993), this court considered a defendant's challenge to a jury's being instructed that it could take his voluntary intoxication into consideration if he "was utterly devoid of consciousness or awareness." We said:

"Defendant contends this makes voluntary intoxication available only if the defendant is comatose and, since being both comatose and capable of doing any act is impossible, the defense is nullified. The complained-of language appears in *State v. Falke*, 237 Kan. 668, 683, 703 P.2d 1362 (1985), and *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973). We hereby disapprove of the inclusion of that phrase."

Based on the overall picture painted by the lengthy and numerous instructions which the trial court had given on voluntary intoxication, this court concluded, however, that "no reversible error has been shown." 252 Kan. at 297.

Ludlow contends that even though the "utterly devoid" language did not constitute reversible error in the *Walker* case, it should in the present case due to significant differences in the factual circumstances of the offenses and in the context in which the jury received the problematic language.

First, Ludlow asserts that "[t]here will never be a case in which the factual evidence of voluntary intoxication is any stronger." He also contends that on the facts of this case, which involved an "alcoholic blackout," it would be particularly difficult for the jurors to reconcile the condition described by Dr. Goodwin and the condition described in the erroneous part of the instruction.

Ludlow points out that during deliberations, the jury sent out the following request: "Define utterly devoid of consciousness or awareness of what he was doing." The jury added: "If possible, give an example." The district court responded: "My answer to that is that he wasn't conscious of what he was doing or aware of what he was doing. I cannot define it any more than that and I cannot give you an example." The State argues that "[t]his response removed any doubt as to what 'consciousness' or 'awareness' meant." We agree. Although the use of the devoid of consciousness language was error, the trial court's response cured the error.

In addition, it appears that in *Walker* the court's disapproval was based on Walker's argument that it would be impossible to be "both comatose and capable of doing any act." 252 Kan. at 297. The argument may be seen somewhat differently in the light of Dr. Goodwin's testimony. It was his opinion that Ludlow experienced an alcoholic blackout in which he was able to perform complex acts over an extended period of time, appear functional to a casual observer, and yet have no memory of what he had done. A question that Dr. Goodwin's testimony did not resolve was whether Ludlow was conscious of what he was doing as he was doing it but could not remember later what he had done or whether he performed the acts without consciousness.

Ludlow also argues that the error of the extraneous language in the voluntary intoxication instruction was compounded by the district court's failure to give PIK Crim. 3d 52.08. The instruction states:

"The defendant claims as a defense that (*here describe the defense claimed*). Evidence in support of this claim should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant. If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you should find the defendant not guilty."

Ludlow does not state whether he requested the instruction. Defense counsel's single remark at the instruction conference, "We have no objection to anything, Your Honor," would not indicate that he had requested it or, if so, that he objected when it was

refused. Moreover, voluntary intoxication is not an affirmative defense.

In particular, Ludlow complains of the jurors not being instructed that "[t]he State's burden of proof does not shift to the defendant." He contends that the absence of PIK Crim. 3d 52.08 operated to place an undue burden on him of proving voluntary intoxication, in violation of due process. The State points out that the jury was given Instruction No. 21, in which it is stated that the State bears the burden of proving "the required criminal intent of the defendant" and that "[t]his burden never shifts to the defendant." Taken together, Instructions Nos. 17 and 21 advise the jury that voluntary intoxication may be a defense if the evidence indicates that it rendered Ludlow incapable of forming the necessary intent, that the State has the burden of proving intent, and that Ludlow does not have a burden for showing lack of intent.

Finally, Ludlow complains that Instruction No. 21, which states that "[o]rdinarily a person intends all of the usual consequences of his voluntary acts," negates the defense of voluntary intoxication. Instruction No. 21 (and PIK Crim. 3d 54.01) state:

"Ordinarily a person intends all of the usual consequences of (his) (her) voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The Comment to PIK Crim. 3d 54.01 shows that Ludlow's complaint has long ago been raised and resolved:

"In *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979), the Court held that from an instruction like the first sentence of prior PIK 54.01, standing alone, a jury could infer that it was incumbent upon the defendant to prove his lack of intent by some quantum of proof.

"*Sandstrom* was not inconsistent with earlier Kansas cases holding that PIK 54.01, read as a whole, did not shift the burden to the defendant on the issue of intent. See *State v. Warbritton*, 211 Kan. 506, 506 P.2d 1152 (1973); *State v. Lassley*, 218 Kan. 758, 545 P.2d 383 (1976), wherein the Court held PIK 54.01 valid where the jury is informed that the burden to prove criminal intent is on the prosecution beyond a reasonable doubt and that the presumption does not dispense with this burden nor nullify the presumption of innocence; and *State v. Woods*, 222 Kan. 179, 563 P.2d 1061 (1977), reaffirming *Lassley*. Nev-

ertheless, the present instruction is designed to make it crystal clear that the 'presumption' is only a permissive inference, leaving the trier of fact free to consider or reject it.

"This instruction has been approved in *State v. McDaniel and Owens*, 228 Kan. 172, 180, 612 P.2d 1231 (1980); *State v. Costa*, 228 Kan. 308, 320, 613 P.2d 1359 (1980); *State v. Robinson, Lloyd and Clark*, 229 Kan. 301, 306, 624 P.2d 964 (1981), and *State v. Beebe*, 244 Kan. 48, 58, 766 P.2d 158 (1988). It also has been thoroughly discussed in *State v. Mason*, 238 Kan. 129, 708 P.2d 963 (1985), and in *State v. Ransom*, 239 Kan. 594, 605, 722 P.2d 540 (1986)."

The judgment is affirmed.