No. 79,018

STATE OF KANSAS, *Appellee*, v. SOOD PATRICK CRAVATT, *Appellant*.
(979 P.2d 679)

Opinion filed May 4, 1999.

*Mary D. Prewitt*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*Gary L. Foiles*, county attorney, argued the cause, and *Jennifer Passiglia*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Sood Patrick Cravatt was convicted of first-degree murder and aggravated assault. He claims on appeal that trial court instructions on voluntary intoxication denied him a fair trial, that the evidence failed to support premeditation notwithstanding the jury verdict, that prosecutorial misconduct during cross-examination and final argument requires reversal, and that venue should have been changed based upon his pretrial motion. We conclude that no reversible error occurred and affirm.

This is a tragic case involving the shooting death of 20-year-old Scott Blenz. Nineteen-year-old Sood Patrick Cravatt shot Scott with his .45 caliber Ruger pistol between the eyes at point blank range, killing him instantly. Both Scott and the defendant were attending a birthday celebration in Arkansas City at the home of Chad Watson on February 10, 1996. Other than the defendant's alcohol consumption and statements made by him during the evening that persons, including the victim, were giving him a hard time at the party, there is little evidence concerning a motive for the killing.

A detailed statement of facts is required to address the defendant's claims. On February 10, 1996, the defendant, his wife Amanda, and their 3-year-old son drove from their home in Sulphur, Oklahoma, to Arkansas City to visit his wife's family. The defendant had recently been laid off from his job in Oklahoma.

They arrived in Arkansas City around 11:30 a.m. and went to the home of Kathy and Gene Watson on Fourth Street (the Fourth Street house). Kathy and Gene Watson were Amanda's aunt and uncle, and the defendant and his family usually stayed at their house because they had extra room. Amanda's father, Mike Watson, lived with Amanda's brother, Chad Watson, in a smaller house on Third Street (the Third Street house) approximately a block and a half away.

The defendant and his family stayed at the Fourth Street house until Mike Watson arrived that afternoon. After having one beer, the defendant and Mike went to Wal-Mart to buy a game for the family to play and to the liquor store for more beer. The defendant and Mike each purchased a 12-pack of beer. They returned to the Fourth Street house about 4:30 p.m. Throughout the rest of the day, the defendant drank 12 beers.

Chad Watson came to the Fourth Street house with his girl-friend, Christina Hills, staying for a few hours. Chad had planned to have friends over that night to celebrate his birthday at the Third Street house. Around 8 p.m., the defendant and Mike walked to the Third Street house to see how the party was going. Chad and Christina were there, along with Chad's friend, the victim in this case, Scott. The defendant and Mike drank beer, listened to music, and watched Chad, Christina, and Scott play cards for about an hour, and then both walked back to the Fourth Street house.

The defendant expressed to his wife a desire to return to the party. She had no problem with that and defendant drove their car back to the party at approximately 9:15 p.m. He took the beer with him as well as his .45 caliber Ruger pistol. The pistol was usually kept in the car because his wife drove the car to work in Ardmore, Oklahoma, and felt safe with it. The defendant testified that he took the gun to the party in order to show it off but also so that it would not get stolen from the car.

Soon after the defendant arrived, John Blenz, brother of the victim, and John's girlfriend, Lynn McGuire, came in. The defendant showed the gun to John, who examined it and then handed it back to the defendant. The defendant set the gun on the table, and John told the defendant that he needed to put the gun away.

The defendant turned the gun to face in a different direction; John then repeated to the defendant that he needed to actually put the gun away. According to the defendant, he then put the gun on top of the stereo in the southwest corner of the dining room. No one else in the house saw the defendant do this, but all agreed that the defendant did put away the gun.

Later, Christina began to feel sick and went to bed. Chad went to check on her. He became sick and vomited in the bedroom. John, Scott, and the defendant went back into the bedroom to tease Chad because he got sick from drinking. Scott then went back into the dining room, and the defendant and John got a washcloth for Chad.

John testified that on the way to get the washcloth, the defendant turned to him and said, "[G]et the fuck out of here. I'll take care of him. I've known him longer than you have." They argued over who had known Chad the longest. The defendant did not remember telling John to get out but acknowledged that he and the defendant argued over who had known Chad the longest. However, the argument quickly ended, and the defendant and John shook hands.

The defendant went into the living room and listened to the stereo in that room. John, Scott, and Lynn began to play Pitch in the dining room. John testified that he asked the defendant if he wanted to play, but the defendant told him he did not know how.

Christina testified that the defendant came back into the bedroom and told her that "these guys won't leave me alone." She gave the defendant a hug and asked him if he wanted her to talk to them and he said no. Later, the defendant came back into the bedroom and again repeated that "these guys won't leave me alone." Christina testified that the defendant was carrying his gun this second time. The defendant said he needed a hug and she hugged him. She again asked the defendant if he wanted her to talk to Scott and John, but the defendant declined the offer. The defendant went back to the dining room.

Back in the dining room, John, Scott, and Lynn had been playing cards for 15 minutes when Lynn began feeding Scott cards so that he would win. John did not like that and stated, "[I]f I have to play

both of you, I'm not going to play." Both John and Lynn testified that John then got up and left. Christina testified that she left the bedroom and went into the kitchen to get some crackers to settle Chad's stomach and saw John putting on his coat. The defendant motioned to her, and when she went over to where he was, the defendant for a third time told her that "these guys won't leave me alone." Once again, however, he declined her offer to talk to them for him. Christina went back into the bedroom.

John testified that before leaving the house, he again shook hands with the defendant and told him there were no hard feelings from their earlier argument. He also testified that at the time the defendant did not seem drunk to him. After driving a short distance, John remembered that his wallet, change, and knife were in a bag in Lynn's horse trailer, which was parked outside the house. He drove back to the house.

Lynn, who had consumed one beer at the time of the shooting, testified that after John left, the defendant sat down at the card table. The defendant asked whether John left because of the earlier argument with the defendant, and Lynn assured him that John was merely mad because of the Pitch game. Both Lynn and Scott urged the defendant to "let it go." Suddenly, according to Lynn, the defendant grabbed the table and overturned it, sending cards, beer, cigarettes, and ashtrays flying across the room. The defendant then said, "I want you all to get the fuck out of this house." As Lynn bent down to pick up her cigarettes she heard Scott tell the defendant that he did not need to tear up the furniture.

The defendant then pulled his pistol from his pants and pointed it at Scott with the barrel a foot from Scott's face. Scott threw his hands in the air and said, "[M]an, you don't have to pull your pistol." Lynn testified that the defendant then pulled back the slide on the pistol and shot Scott in the head. He then turned and pointed the gun at Lynn. She ran into the bathroom and then ran for the bedroom door.

The shot drew Chad and Christina from the bedroom, and they were informed by Lynn that the defendant had just shot Scott. Christina ran outside to find help. She saw someone across the street getting into a car and yelled for them to call 911. The person

turned out to be the victim's brother, John, who had returned to the house. Upon learning that his brother had been shot, John ran into the house. He saw the defendant standing near the south side of the house. Chad and Christina could not tell him what happened because, according to John, they seemed to be in shock. John called 911.

The defendant testified on his own behalf. He acknowledged going back into the bedroom once to talk to Christina and Chad but did not remember saying anything about persons bothering him. On both direct and cross-examination, he emphatically denied shooting the victim. He remembered standing in the living room and hearing John say, "I can't beat both of you all." According to the defendant, he then heard a shot and ran into the living room to see Scott laying on the floor. He became scared and ran out the door and back to the Fourth Street house. The next thing he remembered was talking to his wife and then being put in a police car.

The defendant testified that prior to the day of the shooting, it had been 6 months or more since he had consumed alcohol. On the day of the shooting, he had only a piece of pizza. A blood alcohol test indicated that the defendant's blood alcohol level after the shooting was .210.

Kevin Wallace of the Kansas Highway Patrol walked the defendant out of the Fourth Street house. Wallace testified that as they walked out, the defendant whispered, "I had to." Officer Tommy Scott of the Arkansas City Police Department testified that he took the defendant from the hospital, where the defendant's blood was drawn, to the police department. The defendant asked him about the law in Kansas regarding self-defense. Officer Scott testified that the defendant did not seem intoxicated to him. Jason Barker, another police officer, watched over the defendant prior to the defendant's interrogation by police. During this period of time, the defendant's statements and activity were recorded on videotape, which was later played for the jury.

Barker testified that the defendant asked him what he was supposed to do if he could not remember what happened. When he told the defendant he did not know, the defendant asked what

would happen to him if he could not remember. Again, Officer Barker said he did not know. The defendant then asked about self-defense, but Barker did not answer. Barker testified that at one point the defendant said, "[t]hey were shooting at me."

The .45 caliber Ruger pistol was recovered from the top of an end table at the crime scene. Tests indicated that the bullet which killed Scott was fired from the pistol and also matched the spent shell casing found at the scene. There was no question that the defendant owned the pistol. The autopsy report indicated that Scott had been killed by a single gunshot wound to the forehead between the eyes.

Prior to trial, the defendant filed a motion for change of venue, arguing that pretrial publicity was such that he could not receive a fair trial. After a hearing, the trial court denied the motion.

At the conclusion of the evidence, the trial court instructed the jury on the charge of premeditated first-degree murder, the lesser included offenses of intentional and unintentional second-degree murder, and involuntary manslaughter, as well as the defense of voluntary intoxication. During deliberations, the jury asked a question regarding how it should apply the instruction on voluntary intoxication. The trial court responded with a written instruction set forth in full in this opinion. The defendant claims this instruction requires us to reverse his conviction of first-degree murder.

The defendant was convicted of premeditated first-degree murder and aggravated assault. He was sentenced to life in prison with parole eligibility in 25 years on the charge of first-degree premeditated murder, and 12 months on the aggravated assault charge, to be served concurrently. On appeal, he claims the following trial errors require us to reverse his convictions: (1) erroneous instructions on voluntary intoxication; (2) insufficient evidence to establish premeditation; (3) prosecutorial misconduct in cross-examination and final argument; and (4) failure to grant a change of venue.

(1) <u>Instructions on voluntary intoxication</u>

The defendant's theory before the jury was that he did not shoot the victim. However, other than his statement, the evidence at trial was overwhelming that it was the defendant who shot the victim.

Counsel for the defendant had to delicately follow a path that left open for the jury the issue of voluntary intoxication in the event the jury concluded that it was the defendant who shot the victim. Thus, the issue of the voluntary intoxication of the defendant was of critical importance in this trial.

Two separate instructions on voluntary intoxication were given to the jury. One was given at the conclusion of the evidence before final arguments of counsel. The other was given in written form during jury deliberations in response to the following question by the jury to the trial court: "We want to know how instruction No. 9 [voluntary intoxication] has a bearing on our verdict?" It is the trial court's written response that forms the primary basis of the defendant's contention that we must reverse and remand for a new trial.

While the trial court's conference with counsel on its instruction given during jury deliberations is not contained in the record on appeal, the defendant admits in his brief that there was no objection to this instruction. Nor was there any objection to the trial court's initial instructions on voluntary intoxication. Thus, our standard of review is whether the instructions given on voluntary intoxication are clearly erroneous, *vis.*, whether the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry,* 263 Kan. 118, 131, 947 P.2d 1020 (1997).

The defendant's contention that the initial instruction constitutes error is without merit. The instruction given, Instruction No. 9, was a combination of PIK Crim. 3d 54.12-A and PIK Crim. 3d 54.12-A-1 and provided:

"Voluntary intoxication may be a defense to the charge of murder in the first degree (Instruction No. 2) and murder in the second degree (Instruction No. 4), where the evidence indicates that such intoxication impaired the defendant's mental faculties to the extent that he was incapable of premeditation or forming the necessary intent to kill."

The defendant observes for the first time on appeal that the trial court's reference to Instruction No. 4 above was an inadvertent mistake because clearly the trial court intended to make reference to its second-degree intentional murder Instruction No. 5. Neither

the parties nor the trial court noticed this incorrect reference. The numerical reference was preceded by an accurate written description of the crime to which the instruction applied, and the incorrect numerical reference was corrected in the later instruction on the same subject given to the jury during its deliberations.

The defendant complains that the written description in the initial instruction refers to second-degree murder only, without differentiating between intentional second-degree murder and reckless second-degree murder. He argues that this initial instruction confused the jury and provoked its question regarding voluntary intoxication during its deliberation. The question asked by the jury undermines this contention. The jury asked how the instruction on voluntary intoxication affects its verdict. We do not find the initial instruction confusing, and the clarification made by the trial court in its response to the jury's question during deliberations adequately informed the jury in a nonconfusing manner that the defense of voluntary intoxication applies only to the crimes of murder in the first degree and the lesser included offense of murder in the second degree committed intentionally.

The defendant's main argument involves the trial court's written response to the jury's question sent to the judge during its deliberation: "We want to know how Instruction No. 9 [Voluntary Intoxication] has a bearing on our verdict?" The response of the trial judge consisted of three paragraphs, the last of which the defendant claims requires reversal:

"Reread Instruction No. 1, which instructs you that you must not single out one or more instructions and disregard others, that you should construe each instruction in the light of and in harmony with the other instructions and that you should apply the instructions as a whole to the evidence; Instruction No. 2, which instructs you as to the factual elements the state must prove in respect to the charge of murder in the first degree; Instruction No. 3, which instructs you respecting the burden of proof upon the state; Instruction No. 5, which instructs you as to the factual elements the state must prove in respect to murder in the second degree committed intentionally; Instruction No. 8, which defines premeditation and intentional conduct; and Instruction No. 9, which instructs you when voluntary intoxication may be a defense.

"Instruction No. 9 applies only to the charge of murder in the first degree and the lesser included offense of murder in the second degree committed intentionally because it is only in respect to those offenses that the state must prove an

intent to kill and, in the case of murder in the first degree, premeditation. Instruction No. 9 specifically states that voluntary intoxication may be a defense where such intoxication impaired the defendant's mental faculties to the extent that he was incapable of premeditation or forming the necessary intent to kill.

"The defendant does not have the burden of proving lack of premeditation or lack of intent to kill, but in order for voluntary intoxication to be a defense to the charge of murder in the first degree or murder in the second degree committed intentionally there must be proof that defendant was intoxicated to such an extent that he was not conscious of what he was doing or that he was not aware of what he was doing."

The essence of the defendant's objection relates to the phrase "intoxicated to such an extent that he was not conscious of what he was doing or that he was not aware of what he was doing." The defendant complains that this language is confusing and places a clearly erroneous standard of proof on the evidence of the defendant, one that is impossible to meet. He argues that the last paragraph denied him the right to present his theory of defense and, thus, a fair trial.

This court has held many times that our review on a claimed instructional error involves a consideration of the instructions as a whole " 'without isolating any one instruction.' " *State v. Hunt*, 257 Kan. 388, 392, 894 P.2d 178 (1995) (quoting *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 [1993]). In *State v. Aikins*, 261 Kan. 346, Syl. ¶ 25, 932 P.2d 408 (1997), we said:

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous."

Our focus must therefore be on the whole of the instructions given to the jury during its deliberation and not just that part relied upon by the defendant. The judge's response must be considered with all of the instructions given and the instructions "read as a whole without isolating any one instruction." See 257 Kan. at 392.

We first observe that the trial court's response was a thoughtful one, obviously given only after careful study of the question and a consideration of how the voluntary intoxication instruction would

work with other instructions given by the court. In the first paragraph of its written instruction, the court identified all the numbered previous instructions bearing upon the question submitted by the jury, advising the jury to construe each instruction in the light of and in harmony with the other instructions and to apply the instructions as a whole to the evidence. This first paragraph is, in our opinion, an intelligent response demonstrating genuine concern by the trial court for the jury's inquiry.

Next, we observe that the second paragraph contains a specific response to the jury question by identifying how the jury is to apply the voluntary intoxication instruction previously given by the court in Instruction No. 9. It specifically advises the jury that the voluntary intoxication instruction applies to first-degree murder and second-degree intentional murder. The court then explains why and how it only applies to these two crimes as a defense. The paragraph contains a clear, correct, and concise statement of Kansas law on voluntary intoxication. Again, we note that the court in this paragraph is specifically responding to the jury's question with helpful instructions.

The final paragraph instructs the jury that the defendant does not have the burden to prove premeditation or intent and explains that in order for voluntary intoxication to be a defense to premeditated murder or intentional second-degree murder, there must be proof that the defendant was intoxicated to such an extent that he was not conscious of what he was doing or that he was not aware of what he was doing. The defendant contends that the third paragraph of the trial court's response is similar to instructional language we have rejected in *State v. Walker*, 252 Kan. 279. He argues that the words used in this case by the trial court, "was not conscious" and "was not aware" are essentially the same words disapproved by this court in *Walker.* There, the court stated that to be a defense to a specific intent crime, the voluntary intoxication must impair the defendant such that he " ' "was *utterly devoid of consciousness or awareness*" of what he was doing.' " (Emphasis added.) 252 Kan. at 296.

The defendant in *Walker* objected to the above instruction, pointing out that one utterly devoid of consciousness or awareness

is comatose. Walker argued that the instruction nullified the voluntary intoxication defense since being both comatose and capable of doing any act is impossible. We noted that the complained-of language had been used in earlier decisions of this court, specifically *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973), and *State v. Falke*, 237 Kan. 668, 683, 703 P.2d 1362 (1985). However, we rejected the phrase "utterly devoid of consciousness or awareness" and disapproved of its use in voluntary intoxication instructions. 252 Kan. at 296-97. At the same time, we held its use in *Walker* was harmless because other instructions given on voluntary intoxication constituted "virtually an anthology of every case law statement on the subject" and, thus, concluded that there was no reversible error. 252 Kan. at 297.

The defendant argues that the phrase we disapproved of in *Walker* is similar to the language used by the trial court in the third paragraph of its written response to the jury during its deliberations: "was not conscious of what he was doing or that he was not aware of what he was doing." Our decision in *State v. Ludlow*, 256 Kan. 139, 148-49, 883 P.2d 1144 (1994), refutes the defendant's argument.

In *Ludlow*, the defendant was convicted of second-degree intentional murder, among other crimes. He presented evidence that prior to the time of committing the murder he had consumed a large quantity of liquor. He presented expert medical testimony that he could have experienced an alcoholic blackout or memory loss. On appeal, Ludlow claimed that instructions given on voluntary intoxication resulted in reversible error. The jury had been properly instructed on the defense of voluntary intoxication in accord with PIK Crim. 3d 54.12-A. However, the trial court in *Ludlow* also included the language previously disapproved in *Walker*:

"The defense of voluntary intoxication requires proof that the intoxication was to such an extent that the defendant was utterly devoid of consciousness or awareness of what he was doing." 256 Kan. at 143.

In addressing this concern we noted:

"Ludlow points out that during deliberations, the jury sent out the following request: 'Define utterly devoid of consciousness or awareness of what he was doing.' The jury added: 'If possible, give an example.' The district court responded: 'My answer to that is that he wasn't conscious of what he was doing or aware of what he was doing. I cannot define it any more than that and I cannot give you an example.' The State argues that '[t]his response removed any doubt as to what "consciousness" or "awareness" meant.' We agree. Although the use of the devoid of consciousness language was error, the trial court's response cured the error." 256 Kan. at 149.

*Ludlow* establishes that there is a distinct difference between "utterly devoid of consciousness or awareness" and "not conscious of what he was doing or that he was not aware of what he was doing." The very language that the defendant now claims confusing was found in *Ludlow* to cure the error. Just as in *Ludlow*, the jury in this case was able by reason of the written response to consider whether the defendant was conscious of what he was doing as he was doing it but could not remember later what he had done or whether he performed the acts without consciousness. 256 Kan. at 149.

Examined in context, we do not find the third paragraph confusing. The entire written response by the trial court served to clear up any earlier incorrect reference in the court's earlier instruction on voluntary intoxication. More importantly, the instruction as a whole is a circumspect, legally accurate, and clear response to an important question bearing upon essential elements of the crimes instructed upon by the trial court.

## (2) The sufficiency of the evidence to establish premeditation

The defendant claims that there was insufficient evidence in this case to establish premeditation. He contends that while there may have been evidence of intent, there is no evidence that he premeditated before shooting the victim.

" 'Where the sufficiency of the evidence of a criminal case is challenged on appeal, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' " *State v. White*, 263 Kan. 283, 293, 950 P.2d 1316 (1997) (quoting *State v. Orr*, 262 Kan. 312, Syl. ¶ 10, 940 P.2d 42 [1977]).

Premeditation is a "state of mind" relating to a person's reasons and motives for acting as he or she did. It is a necessary element of the offense of premeditated murder. The defendant does not complain about the instructions given to the jury on first-degree murder or second-degree murder. Nor does he complain about the trial court's instructions on the definition of the words "premeditation" and "intentionally." These instructions were lifted from PIK Crim. 3d 56.01, 56.03-A, and 56.04. His claim is that the evidence at trial did not establish the essential element of premeditation. Our standard of review, thus, presents but one question: Based upon a review of all the evidence, viewed in the light most favorable to the prosecution, could a rational factfinder have found the defendant guilty beyond a reasonable doubt? We answer the question in the affirmative.

The trial court in this case defined premeditation for the jury as meaning "to have thought over the matter beforehand." In its comments, PIK Crim. 3d 56.04(b) cites the authority for the above definition:

"For authority, see *State v. McGaffin*, 36 Kan. 315, 13 Pac. 560 (1887), in which it is said: Premeditation means 'that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand to kill Sherman.' See also *State v. Johnson*, 92 Kan. 441, 140 Pac. 839 (1914); *State v. Martinez*, 223 Kan. 536, 575 P.2d 30 (1978); and *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988), for approval of this instruction."

The defendant contends that the State's evidence with regard to premeditation was essentially the same as the State used to prove intent. He argues that the evidence established only that he pulled out the gun, aimed, and shot the victim. The defendant argues that while this evidence may prove intent, it falls short of establishing premeditation. According to the defendant, a finding of premeditation based solely on this evidence would effectively destroy the distinction between first-degree murder and second-degree intentional murder.

The evidence of premeditation need not be direct and often is established by circumstantial evidence. A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989). Premeditation

cannot be inferred from the use of a deadly weapon alone; it may be inferred where other circumstances also exist. *State v. Hill*, 233 Kan. 648, 652, 664 P.2d 840 (1983). Circumstances which may give rise to the inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *State v. White*, 263 Kan. at 294.

The weapon used in this case was a deadly one. The evidence, taken in the light most favorable to the State, consistent with our standard of review, establishes that the victim was playing cards and unarmed. Without any provocation, the defendant pointed his pistol at the victim, cocked it, and shot the victim in the head. While being escorted to the police station, the defendant stated that he had to do it. On several occasions during the evening, including one instance close in time to the shooting, the defendant complained that John Blenz and the victim would not leave him alone. The shooting occurred after John left the house.

We began our discussion in this case by saying that there was little evidence of the defendant's motive for killing the victim. The state of mind of a defendant and whether he or she acted with premeditation is an issue which the law reserves unto the jury. The jury has a right to infer premeditation from the established circumstances of the case provided the inference is a reasonable one. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). On proper instructions regarding both first-degree premeditated murder, second-degree intentional murder, and voluntary manslaughter, the jury concluded that the defendant was not only capable of premeditation but, in fact, did with premeditation shoot the victim in the face. We conclude, based upon a consideration of all the evidence, viewed in the light most favorable to the prosecution, that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of first-degree premeditated murder.

**(3)** <u>Prosecutorial misconduct in cross-examination and final argument</u>

### Cross-examination

In the State's cross-examination of the defendant, addressing the defendant's earlier testimony regarding the fact that he had stopped drinking at his wife's request 6 months earlier but then had purchased beer on the date of the murder, the State asked the following questions, which form the basis for the defendant's complaint on appeal:

"[State]: Father-in law knew you had stopped drinking? Your wife told you to stop drinking, and nobody tried to stop you from going to the liquor store that day; is that right?

"[Defendant]: Correct.

"[State]: Now, the real reason you stopped drinking is because you have a tendency to change personalities when you've been drinking; is that correct?

"[Defendant]: No, sir.

"[State]: That's not the real reason?

"[Defendant]: No, sir.

"[State]: You didn't know you were developing an alcohol problem?

"[Defendant]: No, sir."

The defendant did not object. On appeal, he argues that the questions asked made assertions of fact that were highly inflammatory and never supported by trial evidence. As a general rule, counsel may not make assertions of fact in the form of questions to a witness absent a good faith basis for believing the asserted matters to be true. *State v. Marble*, 21 Kan. App. 2d 509, 512, 901 P.2d 521, *rev. denied* 258 Kan. 861 (1995). See Graham, Evidence: Text, Rules, Illustrations and Problems, p. 436 (2d ed. 1989); KRPC 3.4(e) (1998 Kan. Ct. R. Annot. 357). An overruled objection at trial would have provided a basis for review. It would have also required the State to proffer its basis for the above questions. However, the claimed error is subject to the general rule applied on appeal in criminal cases: "An issue not presented to the trial court will not be considered for the first time on appeal." *State v. Gardner*, 264 Kan. 95, 106, 955 P.2d 1199 (1998).

Final argument

Recently this court set forth the standards to be followed on appeal in determining whether improper remarks made by a prosecutor during closing argument provide a basis for reversal. In *State v. Sperry*, 267 Kan. 287, 978 P.2d 933 (1999), and *State v. Lumley*, 266 Kan. 939, 976 P.2d 486 (1999), we stated that Kansas does not ordinarily apply the plain error rule and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *Lumley*, 266 Kan. at 964-65. Where the appellate court, in examining a claimed error of prosecutorial misconduct, determines that the misconduct may rise to the level of violating a defendant's right to a fair trial, the claimed error will be considered. Thus, the plain error rule is recognized where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation that if not corrected will result in injustice or a miscarriage of justice. See *Sperry*, 267 Kan. at 308-09.

The appellate standard of review is the same in cases where the issue of prosecutorial misconduct is preserved by objection at trial and in cases where not so preserved, but where the claimed error has been determined to implicate a defendant's right to a fair trial and, thus, rises to the level of a denial of the defendant's Fourteenth Amendment right to due process. See *Sperry*, 267 Kan. at 308-09. The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, the appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that in criminal trials, the prosecution is given wide latitude in language and in manner of presentation of closing argument as long as it is consistent with the evidence adduced. Second, the appellate court must determine whether the remarks constitute plain error; that

is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, requiring reversal. See *Sperry*, 267 Kan. at 309; *Lumley*, 266 Kan. 939, Syl. ¶ 12.

In determining that a prosecutor's improper remarks made in closing argument are not so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, the reviewing court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. This is a harmless error analysis. The court must be able to declare beyond a reasonable doubt that the error was harmless. Each case must be scrutinized on its particular facts to determine whether prosecutorial misconduct is harmless error or plain error when viewed in the light of the trial record as a whole. *Lumley*, 266 Kan. at 959.

With the above standards in mind, we examine the specific contentions of the defendant with reference to the following comments made by the State during its closing argument. We note that the defendant did not object to any of the following remarks but claims on appeal that the remarks require reversal.

### Statements characterizing the defendant as a murderer

Prosecutor's statement:

"The defendant wants you to let a murderer go free based upon three things; the table, was it up or down? Who knows for sure. The gun wasn't found right away. And the length of time it takes to drive around a block.

"Defendant wants you to let a murderer go free for those three reasons. Are you going to let a murdered [*sic*] go free based upon pure speculation?
. . . .
". . . Are you going to let a murderer go because the officer didn't see the gun earlier?
. . . .
"Of course the suggestion is, well, [Lynn McGuire] used to date John Blenz. So is she going to perjure herself? She is going to let a murdered [*sic*] off.

"Don't let a murderer go free because of these half-baked theories the defense has presented to you."

The defendant contends that the State's reference to him as a murderer was improper and prejudicial. In support of this conten-

tion, he cites *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993), and *State v. Zamora*, 247 Kan. 684, 803 P.2d 568 (1990).

We have held that a prosecutor is under a duty to insure that only competent evidence is submitted to the jury and must guard against anything that could prejudice the minds of the jurors and hinder them from considering only the evidence adduced, such as appeals to sympathy or prejudice. See *State v. Ruff*, 252 Kan. at 636. In *Ruff*, we reversed a defendant's conviction because of an improper statement of the prosecutor during closing argument to the effect that the jurors should not allow the defendant's conduct to be tolerated in their county. We found that the prosecutor's statement implied that if the jury found Ruff not guilty, her conduct would be tolerated, and we further found that the statement was not harmless error. 252 Kan. at 636. It is important to note that Ruff objected to this statement but the trial court decided to allow it despite the objection.

In *State v. Zamora*, we reversed a defendant's conviction where the prosecutor, during closing argument, had stated: " 'He [Zamora] has raped this victim once. If he is found not guilty, he will get away with it again.' " 247 Kan. at 689, 691. We held that this statement transcended the limits of fair discussion of the evidence and constituted reversible error. 247 Kan. at 690-91. Once again, an important part of our holding was the fact that Zamora had objected to the comment but had been overruled and his later motion for mistrial based on the subject was denied by the trial court.

The remarks made by the State in the instant case are not of the same type condemned in *Ruff* and *Zamora*. While the State does refer to the defendant as a murderer, the import of the remarks made concerns the evidence presented rather than a simple appeal to the jury's sentiments. Rather than promise dire consequences if the defendant was set free, the remarks asked the jury not to let a person who had, from the evidence, committed murder go free simply because of the defendant's highly implausible statements. As the State correctly notes, we have in the past allowed the prosecution to refer to the defendant as a "murderer" so long as nothing in the statement predicts consequences of acquittal or intensifies

any kind of "fear in the neighborhood" sentiment. See *State v. Collier*, 259 Kan. 346, 355, 913 P.2d 597 (1996). We conclude that under the facts of this case, the State's comments were within the realm of fair comment on the evidence and were not improper. They created no duty on the part of the trial court to take any action to protect the defendant's right to a fair trial.

### Statements regarding voluntary intoxication

The defendant also complains of comments the State made during closing arguments concerning the defense of voluntary intoxication. The first of the voluntary intoxication comments is the following:

"Now, if the defendant would have just said, look, I was drunk that night. I don't know whether I did it or not, but it looks like I probably did but, if I did it, it was totally out of character for me. I didn't intend to do it. But that's not what the defendant says. He said, I didn't do it.

"Now under the first scenario, if he said, you know I probably did, I was just drunk; you might have found to [*sic*] have some sympathy for him. He wants his cake and he wants to eat it, too. He wants you to believe he didn't do it; then he wants to say, but, if you think I did, I was too drunk. He wants his cake and he wants to eat it too.

"Don't reward him with that inconsistent wish."

The defendant contends that the law recognizes that a defendant may assert both innocence and the defense of voluntary intoxication, and that the State should not have been allowed to comment on the inconsistencies. However, while the law may permit such defenses in combination, this does not mean that the State must refrain from commenting on the inherent difficulties of asserting both. These remarks fall within the "wide latitude in language and in manner or presentation of closing argument" set forth in *Lumley*, 266 Kan. 939, Syl. ¶ 12.

The State continued its argument on intoxication by saying:

"Involuntary [*sic*] intoxication. It's only a defense to first degree murder and second degree and intentional murder. It's not a defense to reckless second or involuntary. *Basically, what this provision of law is, the practical effect is it's rewarding these people who get drunk and shoot somebody as opposed to those who stay sober and shoot somebody.*" (Emphasis added.)

The defendant argues that the prosecutor, by the above remarks, injected his personal opinion of the voluntary intoxication defense into argument and encouraged the jury not to "reward" the defendant by considering the defense. We agree and conclude that the above argument, for the reasons asserted by the defendant, constitutes prosecutorial misconduct. *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984). It is a well-established rule in this State that error is committed when a prosecutor injects his or her personal opinion into the closing argument. 235 Kan. at 859.

After the prosecutor's argument, the jury during its deliberations sent the following question to the court: "We want to know how Instruction No. 9 [voluntary intoxication] has a bearing on our verdict?" We have already discussed at length in this opinion the trial court's written response and concluded that no error occurred in this supplemental written instruction on voluntary intoxication.

We know from the question that the jury was puzzled on how to apply previous court instructions on voluntary intoxication. Perhaps this question was provoked by the comments made above by the prosecutor during final argument. However, from the fact that the jury was asking questions regarding the application of the voluntary intoxication instruction, it is clear that the jury was indeed considering the instruction. We have already discussed at length the efficacy of the trial court's instructions regarding voluntary intoxication. The instructions cured any error resulting from the prosecutor's argument.

Statement appealing to sympathy

The defendant argues that the following comments by the prosecutor in closing appealed to the jury's sympathy, thereby requiring reversal:

"When examining the legal intricacies of this case, when reading this cold white paper, don't ever forget the human life that was taken on February 10, 1996.

"James Scott Blenz was 21 years old. He'll never live again. The defendant shot him in cold blood. Don't let him get away with it."

The defendant did not object to the above argument, and we conclude that the statement was not so gross and flagrant as to require intervention by the trial court in the absence of an objec-

tion. It is true that we have held that a prosecutor should not use statements calculated to inflame the passions and prejudice of the jury or divert the jury from its duty to decide the case under the controlling law. *See State v. Spresser,* 257 Kan. 664, 669, 896 P.2d 1005 (1995). However, the above comments do not fall within the proscription expressed in *Spresser* but rather ask the jury to seriously consider the nature of the defendant's act towards the victim.

(4) Failure to grant a change of venue

The defendant's final argument is that the trial court erred in denying his motion for change of venue. The defendant contends that the pretrial publicity in this case denied him a fair trial.

In *State v. Anthony,* 257 Kan. 1003, 1013, 898 P.2d 1109 (1995), we stated:

"The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. [Citation omitted.] The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. [Citation omitted.]"

Media publicity alone has never established prejudice per se. *State v. Ruebke,* 240 Kan. 493, 500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987). The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Shaw,* 260 Kan. 396, 406, 921 P.2d 779 (1996).

In support of his motion for change of venue, the defendant presented 18 articles from two local newspapers regarding the crime. The vast majority of the articles are simply renditions of the known facts of the crime, as well as updates on the proceedings leading to trial. However, one of the articles is an interview with Nancy Blenz, mother of the victim, wherein she speaks of eventually being able to forgive the defendant for the crime. Another article contains an interview with Jo Ann Williamson, a counselor with the Cowley County Mental Health Center. In the interview,

Williamson states, "It wouldn't surprise me if someone with [the defendant's] profile suddenly exploded." She continued, "He sounds like someone who could be under a lot of stress and performance demands. He could be striving so much because he feels that things have to be perfect." Williamson also stated that this did not mean that the defendant would or did commit the crime. Her comments were repeated in another article. A final article includes statements of the victim's mother and friends that the defendant should not have been let out on bond and that the defendant should get the death penalty if convicted.

While the pretrial publicity was intensive, it does not appear out of the ordinary for a murder trial. Nor does it appear particularly one-sided, even considering the above-mentioned articles. Further, picking a jury was not difficult in this case. Only one juror was dismissed because she felt that she could not be impartial based on what she had read about the crime. Three other jurors were dismissed for various reasons; one because he was a co-worker of the deceased, one because he did not feel he could vote to acquit if there was an eyewitness, and one because he felt he would be prejudicial to the State because he was unhappy with the way his son had been treated in an earlier trial. The court made no attempt to press any jurors into service, nor was such an attempt ever necessary.

In *State v. Ruebke*, we stated:

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that here was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue." 240 Kan. at 500-01.

See also *State v. Butler*, 257 Kan. 1043, 1058-59, 897 P.2d 1007 (1995) (holding that failure to change venue not abuse of discretion

where court had little trouble obtaining a jury); *State v. Swafford,* 257 Kan. 1023, 1037, 897 P.2d 1027 (1995); *State v. Anthony,* 257 Kan. at 1015-16.

In the case at hand, considering the nature of the articles and the relative ease in obtaining a jury, the trial court's decision to deny the motion for change of venue is not a decision with which no reasonable person would agree. As a result, the trial court did not abuse its discretion in denying the motion.

Affirmed.